THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
SAM HARROD III, Defendant-Appellant.

Fourth District   No. 4—85—0229

Opinion filed January 13, 1986.

Robert H. Jones, Ltd., of Peoria, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma J. Stewart, Solicitor General, and Mark L. Rotert and Terence M. Madsen, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE KARNS delivered the opinion of the court:

Sam Harrod III was convicted of the offense of perjury (Ill. Rev. Stat. 1983, ch. 38, par. 32—2) after a trial by jury in the circuit court of Sangamon County. On appeal, he contends that he was denied a fair trial and that the State failed to prove his guilt beyond a reasonable doubt.

Harrod was indicted for making a false statement under oath while he was being questioned before the Inquiry Board of the Attorney Registration and Disciplinary Commission (ARDC) in connection with the execution of the alleged will of Sidney Winkler and Harrod's subsequent filing of the document for probate in McLean County circuit court. Specifically, the indictment charged that Harrod knowingly made the following false statement:

"*** that Daniel Harrod met Sidney Winkler and himself in the hallway of the Harrod Law Office on the morning of January 11, 1982, at which time he informed Daniel Harrod that Sidney Winkler just signed his Will and Sidney Winkler stated 'Yes, that's right,' ***."

The events which gave rise to the ARDC inquiry were related at trial and are pertinent to the issues presented. As brief a summary as possible follows.

At the heart of the criminal complaint against Harrod are the suspicious circumstances surrounding the execution of a will filed for probate by Harrod and purportedly executed by Sidney Winkler. Ronald Schertz, a practicing attorney in Peoria, was a cousin to Sidney. He represented Sidney and his siblings, Christine and Elmer. When Christine died in 1979, Schertz worked with Sidney in connection with the administration of her estate. Sidney protested the size of Schertz' bill and engaged Harrod to represent him in a fee dis-

pute. Ultimately, Sidney paid the bill in full. Sidney also hired Harrod to assist him in certain matters concerning his brother Elmer, who was living in Missouri and whose estate Sidney believed was being mishandled by the conservators there.

Sidney was described by Schertz as an elderly man who lived a somewhat eccentric lifestyle and who believed the United States Government was Communistic. When Sidney died on March 19, 1982, Schertz went to his home to protect the valuables and to look for a will. He found a will made by Sidney in 1967 on which the names of the testator, the beneficiary, the executor, and Sidney's signature had been obliterated. He approached Harrod on March 23, 1982, and asked if Sidney had a will. Harrod responded affirmatively but then became evasive and indicated he would have to check. Despite Schertz' numerous attempts to contact Harrod and learn if he possessed a will executed by Sidney, Schertz was never able to get any information from Harrod or his office.

On April 23, 1982, Schertz' law firm filed a petition for letters of administration for Sidney's estate and advised Harrod of this action by letter. Schertz learned subsequently that a will was filed in McLean County on May 7, 1982. In the purported will, Sidney named Eureka College as its chief beneficiary, with Maple Lawn Homes receiving 10% of the estate. The will was attested by defendant and his brother, Dan Harrod. Suspicious of the validity of the scrawled signature on the filed will, Schertz called the attorney who represented Elmer's conservator in Missouri, and recommended Wayne Hanold, a Peoria lawyer, to contest the will. Hanold was retained by the conservator on a contingent fee basis.

Harrod and the Woodford County Bank were named co-executors in the Winkler will. Harrod sought the services of Loren Thomson, a Bloomington attorney, when he learned that the will's authenticity was going to be challenged. Thomson testified that he agreed to represent the Woodford County Bank and met with Harrod in late June 1982 to discuss the will contest. Harrod told him that he believed there would be a conflict of interest if he, a co-executor, also represented the estate. Thomson attempted to learn the details of the execution of Sidney Winkler's will.

Harrod told Thomson that Sidney, who had regularly come to his law offices unannounced, had made an appointment for January 9, 1982, a Saturday. Harrod said that Sidney discussed the provisions of his will and, because no secretaries were in the office to type the will, he told Sidney he would have to return on Monday to sign it. On January 11, early in the morning, Sidney returned to the office

where, again, he was alone with the defendant. Harrod told Thomson that Sidney was "in some sort of physical distress *** holding his hands or arm and *** had complained about falling ***." Harrod said that Sidney signed his will on the corner of the desk, and that at some point Dan Harrod had come into the office. Thomson assumed at the time that Dan had attested the will in the office on that day.

In a later conversation, Harrod told Thomson that Dan was in the office area as Sidney was leaving on the morning he came in to sign his will. Harrod said that he told Dan that Sidney has just signed his will, and that Sidney assented. Thomson made several attempts to discuss the attestation of the will with Dan, but was unsuccessful. Dan refused to testify in support of the will and did not cooperate in any way in the prove-up. Consequently, Thomson was unable to go forward with evidence to establish the will's validity, and he therefore withdrew it from probate. Thomson learned, months later, that Dan had attested the will in front of the Woodford County Sheriff's office.

In September 1982, attorney Hanold filed a complaint with the ARDC concerning Harrod's role in the execution of Sidney's will. In December, Harrod voluntarily appeared before an inquiry board. He testified that, although the attestation clause indicated otherwise, the three signatures on Sidney's will were not executed contemporaneously on January 9, 1982. He stated that he and Sidney signed the will on January 11, and Dan signed it at a later date, out of Sidney's presence. Harrod described the January 11 meeting in detail. The meeting occurred on a very cold, icy day, in the early morning. Harrod stated that Sidney had fallen on the ice, was on crutches, and was assisted by him as he left. In the hallway, at approximately 7:10 or 7:15 a.m., Harrod encountered his brother, Dan. Harrod told the board:

"I think I said something to my brother like 'Mr. Winkler just signed his will, but he doesn't feel good and has to go,' something like that, and he said something on the order of, 'Yes, that's right, but I have to go,' or something like that, and then I assisted him out to his car and he drove away."

Harrod's relation of the hallway encounter formed the gravamen of the indictment for the instant perjury offense.

Dan Harrod was also examined by the inquiry board. The panel concluded that his testimony was "inconsistent" with defendant's account. At trial, Dan testified that he never met his brother and Sidney Winkler in the hallway by their law office, that he was never

told by Sidney that he had signed a will, and that the only time he had ever met Sidney was on an unrelated occasion at the request of his father over a year before. He could not remember exactly when he signed the will but knew that at some time in the winter or early spring, the defendant met Dan on the porch of the sheriff's office in Woodford County. At Sam's request, he signed the will which the defendant explained had been misplaced in a briefcase. During cross-examination Dan equivocated, stating that he had "no specific recollection" of being in the law office on January 11, 1982. This is the same statement he apparently made before the ARDC board, and at two grand jury inquiries. He repeatedly insisted however, that the only time he ever met with Sidney Winkler was on the previous unrelated occasion.

Harrod testified in his own defense, and provided a more detailed account of his relationship with Sidney and the execution of the will. He stated that he had done work for Sidney in the past and that since March 1981, the time of Harrod's father's death, Sidney had been coming to his office once or twice a month. Harrod prepared a will for Sidney in April 1981, which remained unexecuted. That document named Sidney's brother, Elmer, as the beneficiary of the estate, and provided that Eureka College was to inherit if Elmer predeceased the testator. Harrod wrote a letter to Sidney on January 2, 1982, asking him to come in and go over his will. According to Harrod, he and Sidney talked over the 1981 will when Sidney came in without an appointment on Saturday, January 9. Harrod typed a draft of a new will while Sidney waited.

When the draft was completed, Sidney described some changes he wanted. He asked that a provision be included which required the will to remain unfiled for 30 days after his death. He also wanted language in the will specifically excluding Ron Schertz from any role in the estate. The new will was signed on Monday morning when Sidney returned to the office, at 7 a.m., by prearrangement. Harrod testified about Sidney's condition at the time, noticing that Sidney complained of his hands hurting or stinging and also of a fall near the rear door of the law office. Defendant stated that Sidney had to hold the pen with both hands when he signed the will and had trouble controlling it. Harrod was bothered by the scribbled signature and asked Sidney to come back when he felt better and sign a different will.

Next, Harrod recounted the hallway incident, in much the same fashion as he had described it to the ARDC. Harrod learned of Sidney's death from Ron Schertz and admitted to being deliberately

evasive about the existence or nonexistence of a will, because he didn't know where it was at the time. Harrod explained that, a few days after the hallway meeting, he took the will to Dan for his signature, then put it in a briefcase in his office, but forgot it was there. He acknowledged later that in prior testimony before a grand jury, he testified that on the day he found the will in the briefcase, he immediately took it to Dan because he "just felt an obligation to get the thing completed" so he could take it to Bloomington and file it. He completed the paperwork and filed the will later in the same day.

On cross-examination, Harrod admitted that he did not advise attorney Thomson of the problems with Dan's attestation, or tell him about the hallway incident. He recalled only a general business discussion with Thomson about the file. He also admitted that he typed three letters to Sidney which he used on direct to support his version of the events. Although he did the letters himself, he typed his secretary's initials so the letters would appear to have been prepared by her. Harrod never sent Sidney a bill for the will nor did he forward a copy to him. Although, prior to his resignation as co-executor when the will was challenged, he expected to receive compensation for his services in that regard, Harrod's total monetary compensation for all the services he had performed for Sidney totalled $500.

The State produced several witnesses whose testimony was elicited to discredit Harrod's version of the events. Michael Gard, a partner of Ron Schertz, testified that he spoke with Harrod on May 17, 1982. Harrod was irritated that Sidney's estate was the victim of "ambulance-chasing" which was "exactly what Sidney didn't want." Gard stated that Harrod told him that Sidney and the two witnesses had all signed the will in Harrod's offices on a Saturday morning. After Gard, several witnesses were called who testified that Harrod's reputation for truth and veracity was bad.

Other evidence damaged defendant's detailed account of the meeting of January 11, 1982. Nancy Stedman, a nurse employed by the Meadows Mennonite Home, testified that on the morning of January 11, 1982, Sidney Winkler was admitted to the home during her shift. She noted in her report that Sidney was admitted at 8 a.m., but recalled that it took about 10 minutes to assist Sidney into the building from his car. Meadows, near Chenoa, is 25 miles east of Eureka. If Sidney had been to Harrod's office at the time stated, then he had to make the trip from the office to the home in less than 35 minutes. A neighbor of Sidney's testified that Sidney usually drove "very slow, in the forty, forty-five speed type," and it is undisputed

that it had snowed and the weather conditions that morning were very bad.

Nurse Stedman observed a mild case of frostbite on the tips of Sidney's right index and middle finger, but it didn't affect his ability to feed himself. Other witnesses noted on January 10, 1982, that Sidney suffered from frostbite, but no one testified that Sidney had difficulty using his hands or fingers.

Checks written by Sidney were admitted into evidence over objection. Those written on January 9 and January 14 bore legible signatures. Two witnesses who testified that were familiar with Sidney's signature stated that the checks had been signed by Sidney, but, in their opinion, the purported will did not bear Sidney's handwriting.

Witnesses helpful to defendant's case included 18 men who characterized Harrod as an honest man with an excellent reputation for truthfulness and veracity. James Harrod, the younger brother of Sam and Dan, testified that a very strained relationship existed between the lawyer brothers, and that Dan was jealous and resentful of the defendant.

John McAllister, an Illinois State trooper, testified that on the morning of January 11, 1982, he answered a 7:30 a.m. dispatch. He found an elderly gentleman, confused and excited, having trouble getting his car started. He identified the man as Sidney Winkler, but admitted on cross-examination that he had never seen the man before or since. Trooper McAllister's assistance of the motorist took place on Route 24, about five miles from Eureka and 26 miles from Chenoa. He left the site at 7:50 a.m.

Based on this evidence, the jury returned a guilty verdict. Defendant insists that he was not proved guilty beyond a reasonable doubt because a "quantitative" rule of evidence required corroboration more substantial than that presented at trial to support a perjury conviction.

We have examined the record most carefully and have considered the circumstances which led to the ARDC inquiry, which defendant argues created a reasonable doubt of guilt. He argues that defendant received little financial gain from his representation of Sidney Winkler, while two principal characters in this unique story had much at stake. The will was first challenged by Ron Schertz, who was a collateral heir of Elmer Winkler, since deceased, and who stood eventually to reap the benefits from an invalidation of the will filed by Harrod. Wayne Hanold, who initiated the ARDC inquiry, received a fee in excess of $200,000 for his representation of Elmer

Winkler's conservator, an enormous sum which is disproportionate to the legal work involved, according to defendant's argument, inasmuch as there was no proof offered in support of the admission of the alleged will to probate. Nevertheless, we must reject defendant's claim that the State failed to prove his guilt beyond a reasonable doubt, because the totality of the evidence convincingly establishes Harrod's culpability.

■ The evidence required to support a conviction for perjury is sufficient if presented by the direct testimony of only one witness if it is confirmed or corroborated by other evidence of material circumstances tending to establish the falsity of the alleged perjured statement. (*People v. Beaston* (1977), 55 Ill. App. 3d 203, 207, 371 N.E.2d 131, 133-34.) Defendant urges that the standard stated in *Beaston* is equivalent to the so-called "two-witness" rule. That rule, rooted in common law, has been variously stated and applied in Federal perjury cases. A clear expression of the two-witness rule was provided in *United States v. Diggs* (7th Cir. 1977), 560 F.2d 266, 269, 270:

> "As currently applied the two-witness rule does not literally require the direct testimony of two separate witnesses, but rather may be satisfied by the direct testimony of one witness and sufficient corroborative evidence.
>
> * * *
>
> The two-witness rule is * * * satisfied when there is direct testimony from one witness and additional independent evidence so corroborative of the direct testimony that the two when considered together are sufficient to establish the falsity of the accused statements under oath beyond a reasonable doubt."

Defendant characterizes the two-witness rule as a quantitative formula of evidence requiring that the corroborative testimony be as strong and convincing as the direct testimony, and producing an abiding conviction of guilt beyond a reasonable doubt. Defendant claims that the proof against him consisted of equivocal testimony from Dan Harrod and tenuous circumstantial evidence.

■ We are unconvinced that Illinois maintains the two-witness rule applied in the Federal courts. And, although *Beaston* does not provide a criterion for the degree of corroborative proof necessary to support a perjury conviction, it clearly does not suggest the stringent standard advanced by defendant. Rather, the Illinois rule found in *Beaston* requires only corroboration which tends to establish the falsity of the statement alleged to be perjurious. *People v. Beaston* (1977), 55 Ill. App. 3d 203, 207, 371 N.E.2d 131, 134.

The direct testimony of Dan Harrod, who denied meeting Sidney Winkler in the hall on the day the purported will was signed, demonstrated the falsity of defendant's testimony at the ARDC inquiry. In corroboration, the State presented testimony which, if believed, was wholly at odds with defendant's statements to the inquiry panel. Most importantly, Nurse Stedman testified that Sidney Winkler was admitted to the Meadows nursing home a brief time after he was allegedly at Harrod's office. Although defendant's witness, Trooper McAllister, placed Sidney 26 miles from the Meadows home at the time Nurse Stedman stated he was admitted, it is apparent that the jury chose to reject this testimony. Additionally, Nurse Stedman testified that she had not noted that Sidney had any difficulty with the use of his hands, which defendant has asserted were in such poor condition that Sidney could barely hold a pen to sign his name.

■ Moreover, defendant's version of the events as a whole is replete with inconsistencies and puzzling details which the jury could well have considered implausible. Some notable examples include defendant's omission of the details of the purported will's attestation during his conferences with Loren Thomson, the letters defendant wrote to Winkler with a secretary's initials, the misplacement of the will in a briefcase and the haste when it was discovered, and Harrod's failure to send Sidney a copy of the will. The events described by the various witnesses, when viewed as a whole, along with the peculiarity of the drafting and execution of the alleged will, are supportive of he State's theory of the case and sufficiently corroborative of the allegation that Harrod perjured himself when he testified before the ARDC.

Defendant argues alternatively that he was denied a fair trial because the court refused to instruct the jury concerning the burden of proof required of the prosecution to establish defendant's motive. Before trial, the State was ordered to furnish the defense with any evidence they intended to offer which was "directed solely to motive." The State responded that they possessed no such evidence. At trial, defendant testified on direct that he had nothing to gain if Eureka College received 90% of the Winkler estate. During cross-examination, the State elicited testimony from defendant concerning his interest in an appointment to the Federal bench in 1982. Defendant confirmed that President Reagan visited Eureka College on May 9, 1982, two days after the alleged will was filed, and during the presidential visit, the college announced the establishment of the President Reagan Scholarship Fund. Winkler's purported will left the bulk of the estate to the college, to be spent at the discretion of its

trustees, and the will went on to state, "but I do hope that they may choose to use some designated for scholarships to assist President Ronald Reagan—Sidney Winkler scholars."

During closing argument, the State suggested that the prospect of a Federal judgeship induced Harrod to mishandle the will and subsequently lie to the inquiry board in order to maintain his status and protect his reputation. Defendant therefore requested an instruction that the prosecution is required to prove motive beyond a reasonable doubt, which the court refused. Defendant now argues that the court's refusal was reversible error, contrary to the dictates of *People v. Enright* (1912), 256 Ill. 221, 99 N.E. 936, and that the error was compounded by the State's deliberate circumvention of the pretrial discovery order. We consider defendant's contention meritless.

■ First, *People v. Enright* (1912), 256 Ill. 221, 99 N.E. 936, does not require that a jury be instructed on motive. On the contrary, the court stated that the prosecution is not required to demonstrate a defendant's motive to commit a crime, and that therefore the jury should not be informed that failure to show it tends to prove that the crime was not committed. (256 Ill. 221, 234, 99 N.E. 936, 941.) The instruction requested by defendant would, in fact, traverse the rule promulgated in *Enright*. We are in accord with the position taken by the Committee on Jury Instructions in Criminal Cases, which chose to abandon a motive instruction on the conclusion that motive is more properly a subject for argument. Committee Note, Illinois Pattern Jury Instructions, Criminal, No. 3.04 (2d ed. 1981).

■ Furthermore, we must disregard defendant's claim that the State violated a discovery order and created unfair surprise to defendant. The prosecutor's inquiry into Harrod's bid for a Federal judgeship was initiated during cross-examination, and was arguably an attempt to discredit Harrod's testimony that he had no vested interest in a bequest to Eureka College. The State introduced a letter written by defendant which demonstrated his solicitation for a Federal appointment. The letter was admitted into evidence without objection. Defendant cannot now be heard to claim unfair surprise. *People v. Ishmael* (1984), 126 Ill. App. 3d 320, 466 N.E.2d 133.

Finally, defendant contends that the court committed reversible error by the exclusion of certain hearsay testimony of defendant's witness, Trooper John McAllister. When McAllister was being questioned by defense counsel concerning his motorist assistance call on the morning of January 11, 1982, the following exchange occurred:

"Q. And then what did you do?

A. Pulled in behind the unit. I got out of my unit. There was a gentleman in the vehicle in front of me and I opened his car door.

Q. All right. What did you find when you opened the car door?

A. I opened his car door. *He advised that he had just left his lawyer's office in Eureka.*" (Emphasis added.)

In response to the State's objection, the court struck the highlighted testimony and instructed the jury to disregard it. Defendant attempts on appeal to characterize the statement as nonhearsay, or alternatively, as a spontaneous declaration. Neither contention is supportable.

■ In order for testimony to qualify as an exception to the hearsay rule as a spontaneous declaration, three elements must be present. There must be an occurrence sufficiently startling so as to produce a spontaneous and unreflecting statement; there must have been an absence of time in which to fabricate; and the statement must relate to the circumstances of the occurrence. (*People v. Robinson* (1978), ·73 Ill. 2d 192, 199, 383 N.E.2d 164, 168.) Even if we were to assume that the disablement of Sidney Winkler's car was a startling event within the purview of the rule of exception, the statement would not qualify as a spontaneous declaration under the third element.

■ It is obvious that the statement was classic hearsay, offered to prove the truth of the matter asserted and confirm Harrod's assertion that Sidney had visited his office on January 11. It was exactly the type of hearsay the rule was created to exclude. McAllister testified that, three years prior to trial, he assisted a nervous, excited elderly man, with whom he spent about 10 minutes. The man's first words when the officer arrived were that he had just come from his lawyer's office. It is apparent that the jury rejected the testimony and not unlikely that the jury viewed the unresponsive statement as contrived. The hearsay evidence was clearly unreliable, and its exclusion was proper.

We hold that the defendant received a fair trial, and that the State met its burden of proving him guilty beyond a reasonable doubt. The conviction is, therefore, affirmed.

Affirmed.

HARRISON and WELCH, JJ., concur.