# JAMES *v.* ILLINOIS

No. 88–6075.   Argued October 3, 1989—Decided January 10, 1990

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-
SHALL, BLACKMUN, and STEVENS, JJ., joined. STEVENS, J., filed a con-
curring opinion, *post*, p. 320. KENNEDY, J., filed a dissenting opinion, in
which REHNQUIST, C. J., and O'CONNOR and SCALIA, JJ., joined, *post*,
p. 322.

*Martin S. Carlson* argued the cause for petitioner. With
him on the briefs were *Theodore A. Gottfried, Michael J.
Pelletier,* and *Patricia Unsinn.*

*Terence M. Madsen,* Assistant Attorney General of Illi-
nois, argued the cause for respondent. With him on the
brief were *Neil F. Hartigan,* Attorney General, *Robert J.
Ruiz,* Solicitor General, *Arleen C. Anderson, Nathan P.
Maddox,* and *Michael J. Singer,* Assistant Attorneys Gen-
eral, *Cecil A. Partee, Inge Fryklund,* and *Sharon Johnson
Coleman.**

JUSTICE BRENNAN delivered the opinion of the Court.

The impeachment exception to the exclusionary rule per-
mits the prosecution in a criminal proceeding to introduce il-

---

**Solicitor General Starr, Assistant Attorney General Dennis, Deputy
Solicitor General Bryson,* and *Joel Gershowitz* filed a brief for the United
States as *amicus curiae* urging affirmance.

legally obtained evidence to impeach the defendant's own testimony. The Illinois Supreme Court extended this exception to permit the prosecution to impeach the testimony of *all* defense witnesses with illegally obtained evidence. 123 Ill. 2d 523, 528 N. E. 2d 723 (1988). Finding this extension inconsistent with the balance of values underlying our previous applications of the exclusionary rule, we reverse.

## I

On the night of August 30, 1982, eight young boys returning home from a party were confronted by a trio of other boys who demanded money. When the eight boys refused to comply, one member of the trio produced a gun and fired into the larger group, killing one boy and seriously injuring another. When the police arrived, the remaining members of the larger group provided eyewitness accounts of the event and descriptions of the perpetrators.

The next evening, two detectives of the Chicago Police Department took 15-year-old Darryl James into custody as a suspect in the shooting. James was found at his mother's beauty parlor sitting under a hair dryer; when he emerged, his hair was black and curly. After placing James in their car, the detectives questioned him about his prior hair color. He responded that the previous day his hair had been reddish brown, long, and combed straight back. The detectives questioned James again later at the police station, and he further stated that he had gone to the beauty parlor in order to have his hair "dyed black and curled in order to change his appearance." App. 11.

The State subsequently indicted James for murder and attempted murder. Prior to trial, James moved to suppress the statements regarding his hair, contending that they were the fruit of a Fourth Amendment violation because the detectives lacked probable cause for his warrantless arrest. After an evidentiary hearing, the trial court sustained this

motion and ruled that the statements would be inadmissible at trial.

At trial, five members of the larger group of boys testified for the State, and each made an in-court identification of the defendant. Each testified that the person responsible for the shooting had "reddish" hair, worn shoulder length in a slicked-back "butter" style. Each also recalled having seen James several weeks earlier at a parade, at which time James had the aforementioned hair color and style. At trial, however, his hair was black and worn in a "natural" style. Despite the discrepancy between the witnesses' description and his present appearance, the witnesses stood firm in their conviction that James had been present and had fired the shots.

James did not testify in his own defense. He called as a witness Jewel Henderson, a friend of his family. Henderson testified that on the day of the shooting she had taken James to register for high school and that, at that time, his hair was black. The State then sought, over James' objection, to introduce his illegally obtained statements as a means of impeaching the credibility of Henderson's testimony. After determining that the suppressed statements had been made voluntarily, the trial court overruled James' objection. One of the interrogating detectives then reported James' prior admissions that he had reddish hair the night of the shooting and he dyed and curled his hair the next day in order to change his appearance. James ultimately was convicted of both murder and attempted murder and sentenced to 30 years' imprisonment.

On appeal, the Illinois Appellate Court reversed James' convictions and ordered a new trial. 153 Ill. App. 3d 131, 505 N. E. 2d 1118 (1987). The appellate court held that the exclusionary rule barred admission of James' illegally obtained statements for the purpose of impeaching a defense witness' testimony and that the resulting constitutional error was not harmless. However, the Illinois Supreme Court re-

versed. The court reasoned that, in order to deter the defendant from engaging in perjury "by proxy," the impeachment exception to the exclusionary rule ought to be expanded to allow the State to introduce illegally obtained evidence to impeach the testimony of defense witnesses other than the defendant himself. The court therefore ordered James' convictions reinstated. We granted certiorari. 489 U. S. 1010 (1989).

## II

"There is no gainsaying that arriving at the truth is a fundamental goal of our legal system." *United States* v. *Havens*, 446 U. S. 620, 626 (1980). But various constitutional rules limit the means by which government may conduct this search for truth in order to promote other values embraced by the Framers and cherished throughout our Nation's history. "Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct. . . . [W]ithout it the constitutional guarantee against unreasonable searches and seizures would be a mere 'form of words.'" *Terry* v. *Ohio*, 392 U. S. 1, 12 (1968), quoting *Mapp* v. *Ohio*, 367 U. S. 643, 655 (1961). The occasional suppression of illegally obtained yet probative evidence has long been considered a necessary cost of preserving overriding constitutional values: "[T]here is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Arizona* v. *Hicks*, 480 U. S. 321, 329 (1987).

This Court has carved out exceptions to the exclusionary rule, however, where the introduction of reliable and probative evidence would significantly further the truth-seeking function of a criminal trial and the likelihood that admissibility of such evidence would encourage police misconduct is but a "speculative possibility." *Harris* v. *New York*, 401 U. S.

222, 225 (1971).[1] One exception to the rule permits prosecutors to introduce illegally obtained evidence for the limited purpose of impeaching the credibility of the defendant's own testimony. This Court first recognized this exception in *Walder* v. *United States*, 347 U. S. 62 (1954), permitting the prosecutor to introduce into evidence heroin obtained through an illegal search to undermine the credibility of the defendant's claim that he had never possessed narcotics. The Court explained that a defendant

> "must be free to deny all the elements of the case against him without thereby giving leave to the Government to introduce by way of rebuttal evidence illegally secured by it, and therefore not available for its case in chief. Beyond that, however, there is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." *Id.*, at 65.

In *Harris* v. *New York, supra,* and *Oregon* v. *Hass,* 420 U. S. 714 (1975), the Court applied the exception to permit prosecutors to impeach defendants using incriminating yet voluntary and reliable statements elicited in violation of *Miranda* requirements.[2] Finally, in *United States* v. *Havens, supra,* the Court expanded the exception to permit

---

[1] See generally *Illinois* v. *Krull,* 480 U. S. 340, 347 (1987) (when evaluating proposed exceptions to the exclusionary rule, this Court "has examined whether the rule's deterrent effect will be achieved, and has weighed the likelihood of such deterrence against the costs of withholding reliable information from the truth-seeking process"); *United States* v. *Leon,* 468 U. S. 897, 908–913 (1984) (discussing balancing approach).

Certain Members of the Court have previously expressed their view that the exclusionary rule is designed not merely to deter police misconduct but also to prevent courts from becoming parties to the constitutional violation by admitting illegally obtained evidence at trial. See *United States* v. *Leon,* 468 U. S., at 931–938 (BRENNAN, J., joined by MARSHALL, J., dissenting); *id.,* at 976–978 (STEVENS, J., concurring in judgment in part and dissenting in part).

[2] See *Miranda* v. *Arizona,* 384 U. S. 436 (1966).

prosecutors to introduce illegally obtained evidence in order to impeach a defendant's "answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination." *Id.*, at 627.

This Court insisted throughout this line of cases that "evidence that has been illegally obtained . . . is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt." *Id.*, at 628.[3] However, because the Court believed that permitting the use of such evidence to impeach defendants' testimony would further the goal of truthseeking by preventing defendants from perverting the exclusionary rule "'into a license to use perjury by way of a defense,'" *id.*, at 626 (citation omitted), and because the Court further believed that permitting such use would create only a "speculative possibility that impermissible police conduct will be encouraged thereby," *Harris, supra*, at 225, the Court concluded that the balance of values underlying the exclusionary rule justified an exception covering impeachment of defendants' testimony.

### III

In this case, the Illinois Supreme Court held that our balancing approach in *Walder* and its progeny justifies expanding the scope of the impeachment exception to permit prosecutors to use illegally obtained evidence to impeach the credibility of defense witnesses. We disagree. Expanding the class of impeachable witnesses from the defendant alone to all defense witnesses would create different incentives affecting the behavior of both defendants and law enforcement officers. As a result, this expansion would not promote the truth-seeking function to the same extent as did creation of the original exception, and yet it would significantly under-

---

[3] See also *Oregon* v. *Hass*, 420 U. S. 714, 721 (1975) ("[T]rial court instructed the jury that the statements attributed to [defendant] could be used only in passing on his credibility and not as evidence of guilt"); *Harris* v. *New York*, 401 U. S. 222, 223 (1971) (same); *Walder* v. *United States*, 347 U. S. 62, 64 (1954) (same).

mine the deterrent effect of the general exclusionary rule. Hence, we believe that this proposed expansion would frustrate rather than further the purposes underlying the exclusionary rule.

The previously recognized exception penalizes defendants for committing perjury by allowing the prosecution to expose their perjury through impeachment using illegally obtained evidence. Thus defendants are discouraged in the first instance from "affirmatively resort[ing] to perjurious testimony." *Walder, supra,* at 65. But the exception leaves defendants free to testify truthfully on their own behalf; they can offer probative and exculpatory evidence to the jury without opening the door to impeachment by carefully avoiding any statements that directly contradict the suppressed evidence. The exception thus generally discourages perjured testimony without discouraging truthful testimony.

In contrast, expanding the impeachment exception to encompass the testimony of all defense witnesses would not have the same beneficial effects. First, the mere threat of a subsequent criminal prosecution for perjury is far more likely to deter a witness from intentionally lying on a defendant's behalf than to deter a defendant, already facing conviction for the underlying offense, from lying on his own behalf. Hence the Illinois Supreme Court's underlying premise that a defendant frustrated by our previous impeachment exception can easily find a witness to engage in "perjury by proxy" is suspect.[4]

More significantly, expanding the impeachment exception to encompass the testimony of all defense witnesses likely would chill some defendants from presenting their best de-

---

[4] The dissent concedes, as it must, that "of course, false testimony can result from faulty recollection" as opposed to intentional lying. *Post,* at 326. Even assuming that Henderson's testimony in this case (as opposed to the detective's contrary testimony) was indeed false, nothing in the record suggests that Henderson intentionally committed perjury rather than honestly provided her best (even if erroneous) perception and recollection of events.

fense—and sometimes any defense at all—through the testimony of others. Whenever police obtained evidence illegally, defendants would have to assess prior to trial the likelihood that the evidence would be admitted to impeach the otherwise favorable testimony of any witness they call. Defendants might reasonably fear that one or more of their witnesses, in a position to offer truthful and favorable testimony, would also make some statement in sufficient tension with the tainted evidence to allow the prosecutor to introduce that evidence for impeachment. First, defendants sometimes need to call "reluctant" or "hostile" witnesses to provide reliable and probative exculpatory testimony, and such witnesses likely will not share the defendants' concern for avoiding statements that invite impeachment through contradictory evidence. Moreover, defendants often cannot trust even "friendly" witnesses to testify without subjecting themselves to impeachment, simply due to insufficient care or attentiveness. This concern is magnified in those occasional situations when defendants must call witnesses to testify despite having had only a limited opportunity to consult with or prepare them in advance. For these reasons, we have recognized in a variety of contexts that a party "cannot be absolutely certain that his witnesses will testify as expected." *Brooks* v. *Tennessee*, 406 U. S. 605, 609 (1972).[5] As a re-

---

[5] These reasons to doubt a party's ability to control the testimony of his own witnesses led long ago to abandonment of the common-law rule that a party automatically "vouches for" and hence is inexorably bound by what the witnesses say. See, *e. g.*, Fed. Rule Evid. 607 ("The credibility of a witness may be attacked by any party, including the party calling him"); see generally 3A J. Wigmore, Evidence § 899, p. 655 (J. Chadbourn rev. 1970) ("[E]very experienced lawyer knows that he is often required to call witnesses who happen to have some knowledge of the facts but whose trustworthiness he could not guarantee. There are also many occasions upon which a lawyer is surprised by the witness testifying in direct contradiction to a prior statement given to the attorney" (citation omitted)); cf. *Chambers* v. *Mississippi*, 410 U. S. 284 (1973) (state evidentiary rule precluding defendant from impeaching own witness after witness offered

sult, an expanded impeachment exception likely would chill some defendants from calling witnesses who would otherwise offer probative evidence.[6]

incriminating testimony violated due process). See also *Imbler* v. *Pachtman*, 424 U. S. 409, 426 (1976) (holding prosecutors absolutely immune from damages liability for having knowingly presented perjured witness testimony against criminal defendants, observing that the "veracity of witnesses in criminal cases frequently is subject to doubt before and after they testify . . . . If prosecutors were hampered in exercising their judgment as to the use of such witnesses by concern about resulting personal liability, [they often would refrain from calling such witnesses and hence] the triers of fact in criminal cases often would be denied relevant evidence"); *id.*, at 446 (WHITE, J., concurring in judgment) ("[O]ne of the effects of permitting suits for knowing use of perjured testimony will be detrimental to the [truth-seeking] process—prosecutors may withhold questionable but valuable testimony from the court").

[6] Apparently to minimize this concern, the Illinois Supreme Court suggested that prosecutors could impeach witnesses only with respect to statements that are "purposely presented by the defendant." 123 Ill. 2d 523, 537, 528 N. E. 2d 723, 729 (1988). However, the court did not even purport to determine whether James had "purposely presented" Henderson's testimony that his hair had been black on the day of the shooting, an omission that clearly highlights "the difficulty of determining whether particular testimony elicited from a defense witness was 'purposely presented' by the defendant." Brief for United States as *Amicus Curiae* 21, n. 5. Given the inherent subjectivity of this proposed test, a defendant could hardly be confident that all witness statements that are actually inadvertent or surprising to the defendant will be found to be such by the trial court so as not to open the door to impeachment. This proposed limitation thus would not meaningfully blunt the chill imposed on defendants' presentation of witnesses.

The Illinois Supreme Court also suggested that prosecutors could be allowed to impeach witnesses only with respect to statements offered on direct examination, perhaps recognizing that defendants likely would feel even more insecure about their witnesses' ability to avoid statements triggering admissibility of suppressed evidence when responding to cross-examination by the prosecutor. We need not decide whether there is a salient distinction between direct and cross-examination in this context, cf. *United States* v. *Havens*, 446 U. S. 620 (1980) (rejecting such distinction with respect to defendants' testimony), because even the more limited ex-

This realization alters the balance of values underlying the current impeachment exception governing defendants' testimony. Our prior cases make clear that defendants ought not be able to "pervert" the exclusion of illegally obtained evidence into a shield for perjury, but it seems no more appropriate for the State to brandish such evidence as a sword with which to dissuade defendants from presenting a meaningful defense through other witnesses. Given the potential chill created by expanding the impeachment exception, the conceded gains to the truth-seeking process from discouraging or disclosing perjured testimony would be offset to some extent by the concomitant loss of probative witness testimony. Thus, the truth-seeking rationale supporting the impeachment of defendants in *Walder* and its progeny does not apply to other witnesses with equal force.

Moreover, the proposed expansion of the current impeachment exception would significantly weaken the exclusionary rule's deterrent effect on police misconduct. This Court has characterized as a mere "speculative possibility," *Harris v. New York*, 401 U. S., at 225, the likelihood that permitting prosecutors to impeach defendants with illegally obtained

---

pansion of the impeachment exception would palpably inhibit defendants' presentation of a defense.

Finally, the dissent embraces the Illinois Supreme Court's suggestion that prosecutors could be allowed to impeach witnesses only when their testimony is in "direct conflict" with the illegally seized evidence. *Post*, at 325. The dissent suggests that judicial inquiry as to the inconsistency of various statements is "commonplace" under various rules of evidence. *Post*, at 325, n. 1. But the result of such an inquiry distinguishing between "direct" and "indirect" evidentiary conflicts is far from predictable. Indeed, the authority upon which the dissent relies to define a direct evidentiary conflict observes that "[s]uch is the possible variety of statement that it is often difficult to determine whether this inconsistency exists." 3A Wigmore § 1040, at 1048. The *ex ante* uncertainty whether a court might find a witness' testimony to pose a "direct" conflict and therefore trigger the impeachment exception likely will chill defendants' presentation of potential witnesses in many cases.

evidence would encourage police misconduct. Law enforcement officers will think it unlikely that the defendant will first decide to testify at trial and will also open the door inadvertently to admission of any illegally obtained evidence. Hence, the officers' incentive to acquire evidence through illegal means is quite weak.

In contrast, expanding the impeachment exception to *all* defense witnesses would significantly enhance the expected value to the prosecution of illegally obtained evidence. First, this expansion would vastly increase the number of occasions on which such evidence could be used. Defense witnesses easily outnumber testifying defendants, both because many defendants do not testify themselves and because many if not most defendants call multiple witnesses on their behalf. Moreover, due to the chilling effect identified above, see *supra*, at 315–316, illegally obtained evidence holds even greater value to the prosecution for each individual witness than for each defendant. The prosecutor's access to impeachment evidence would not just deter perjury; it would also deter defendants from calling witnesses in the first place, thereby keeping from the jury much probative exculpatory evidence. For both of these reasons, police officers and their superiors would recognize that obtaining evidence through illegal means stacks the deck heavily in the prosecution's favor. It is thus far more than a "speculative possibility" that police misconduct will be encouraged by permitting such use of illegally obtained evidence.

The United States argues that this result is constitutionally acceptable because excluding illegally obtained evidence solely from the prosecution's case in chief would still provide a quantum of deterrence sufficient to protect the privacy interests underlying the exclusionary rule.[7] We disagree. Of course, a police officer might in certain situations believe that obtaining particular evidence through illegal means, re-

---

[7] Brief for United States as *Amicus Curiae* 18–22.

sulting in its suppression from the case in chief, would prevent the prosecution from establishing a prima facie case to take to a jury. In such situations, the officer likely would be deterred from obtaining the evidence illegally for fear of jeopardizing the entire case. But much if not most of the time, police officers confront opportunities to obtain evidence illegally after they have already legally obtained (or know that they have other means of legally obtaining) sufficient evidence to sustain a prima facie case. In these situations, a rule requiring exclusion of illegally obtained evidence from only the government's case in chief would leave officers with little to lose and much to gain by overstepping constitutional limits on evidence gathering.[8] Narrowing the exclusionary rule in this manner, therefore, would significantly undermine the rule's ability "to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins* v. *United States*, 364 U. S. 206, 217 (1960). So long as we are committed to protecting the people from the disregard of their constitutional rights during the course of criminal investigations, inadmissibility of illegally obtained evidence must remain the rule, not the exception.

## IV

The cost to the truth-seeking process of evidentiary exclusion invariably is perceived more tangibly in discrete prosecutions than is the protection of privacy values through deterrence of future police misconduct. When defining the precise scope of the exclusionary rule, however, we must focus on systemic effects of proposed exceptions to ensure

---

[8] Indeed, the detectives who unlawfully detained James and elicited his incriminating statements already knew that there were several eyewitnesses to the shooting. Because the detectives likely believed that the exclusion of any statement they obtained from James probably would not have precluded the prosecution from making a prima facie case, an exclusionary rule applicable only to the prosecution's case in chief likely would have provided little deterrent effect in this case.

that individual liberty from arbitrary or oppressive police conduct does not succumb to the inexorable pressure to introduce all incriminating evidence, no matter how obtained, in each and every criminal case. Our previous recognition of an impeachment exception limited to the testimony of defendants reflects a careful weighing of the competing values. Because expanding the exception to encompass the testimony of all defense witnesses would not further the truth-seeking value with equal force but would appreciably undermine the deterrent effect of the exclusionary rule, we adhere to the line drawn in our previous cases.

Accordingly, we hold that the Illinois Supreme Court erred in affirming James' convictions despite the prosecutor's use of illegally obtained statements to impeach a defense witness' testimony. The court's judgment is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

While I join the opinion of the Court, certain comments in the dissent prompt this postscript. The dissent answers the wrong question when it states that "[t]he interest in protecting the truth-seeking function of the criminal trial is every bit as strong in this case as in our earlier cases." *Post,* at 324. This is self-evident. The State always has a strong interest in the truth-seeking function. The proper question, however, is whether the admission of the illegally obtained evidence in this case would sufficiently advance the truth-seeking function to overcome the loss to the deterrent value of the exclusionary rule. With respect to this issue, the dissent overestimates the benefit of the exclusionary rule even to the defendant bent on presenting perjured testimony and exaggerates the injury that exclusion of unlawfully obtained evidence causes to the truth-seeking function.

In "contested criminal trials," *post*, at 326, the urge to win can unfortunately lead each side to overstate its case. As

the Court properly observes, the ability of the dishonest defendant to procure false testimony is tempered by the availability of the illegally obtained evidence for use in a subsequent perjury prosecution of the defense witness. *Ante,* at 314. A witness who is not on trial faces a far different calculus than one whose testimony can mean the difference between acquittal and a prison sentence. He or she will think long and hard before accepting a defendant's invitation to knowingly offer false testimony that is directly contradicted by the State's evidence. The dissent ignores this "hard reality," *post,* at 326, in presuming that a defense witness will offer false testimony when that testimony is immunized from rebuttal at trial.

While the dissent assumes false testimony or, at least, faulty recollection with respect to defense witnesses, it is unwilling to entertain the same assumption with respect to the prosecution's witnesses. The evidentiary issue in this case involves the testimony of a police officer about a statement that he allegedly heard the defendant make at the time of his arrest. An officer whose testimony provides the foundation for admission of an oral statement or physical evidence may be influenced by his interest in effective law enforcement or may simply have faulty recollection. It is only by giving 100-percent credence to every word of the officer's testimony that the dissent can so categorically state that "the defendant himself revealed the witness' testimony to be false," *post,* at 324, that "James . . . said his hair was previously red," *post,* at 327, n. 2, or that information presented to the jury was "known to be untrue," *post,* at 327. That assumption is no more warranted in the case of prosecution witnesses than the opposite assumption is warranted in the case of defense witnesses.

In this case, in which the guilty verdict is supported by the testimony of five eyewitnesses, it is highly probable that these characterizations are accurate. But the testimony of those five witnesses, on which the dissenters rely for their conclusion that any error committed by the trial court was

harmless, *post*, at 330, would also seem to be sufficient to obviate the need to rely on the officer's rebuttal to discredit the witness Henderson's testimony. Were the officer's testimony not so corroborated, it would surely be improper to presume—as the dissenters do—that the conflict between the testimony of the officer and Henderson should necessarily be resolved in the officer's favor or that exclusion of the evidence would result in a decision by jurors who are "positively misled." *Post*, at 324.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE SCALIA join, dissenting.

To deprive the prosecution of probative evidence acquired in violation of the law may be a tolerable and necessary cost of the exclusionary rule. Implementation of the rule requires us to draw certain lines to effect its purpose of deterring unlawful conduct. But the line drawn by today's opinion grants the defense side in a criminal case broad immunity to introduce whatever false testimony it can produce from the mouth of a friendly witness. Unless petitioner's conviction is reversed, we are told, police would flout the Fourth Amendment, and as a result, the accused would be unable to offer any defense. This exaggerated view leads to a drastic remedy: The jury cannot learn that defense testimony is inconsistent with probative evidence of undoubted value. A more cautious course is available, one that retains Fourth Amendment protections and yet safeguards the truth-seeking function of the criminal trial.

Our precedents establish that the exclusionary rule does not apply where the interest in pursuing truth or other important values outweighs any deterrence of unlawful conduct that the rule might achieve. See, *e. g.*, *Illinois* v. *Krull*, 480 U. S. 340, 347–348 (1987); *United States* v. *Leon*, 468 U. S. 897, 906–907 (1984); *Stone* v. *Powell*, 428 U. S. 465, 486–489 (1976); *United States* v. *Calandra*, 414 U. S. 338, 347–348 (1974). One instance is a defendant's attempt to take advantage by presenting testimony in outright contradiction of ex-

cluded facts, secure in the knowledge that the inconsistency will not be revealed to the jury. As we said over 35 years ago:

> "It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* [v. *United States*, 232 U. S. 383 (1914),] doctrine would be a perversion of the Fourth Amendment." *Walder* v. *United States*, 347 U. S. 62, 65 (1954).

Under this rationale, our consistent rule has been that a defendant's testimony is subject to rebuttal by contradicting evidence that otherwise would be excluded. The principle applies to suppressed physical evidence, as in *Walder* itself and *United States* v. *Havens*, 446 U. S. 620 (1980), and to statements obtained in violation of the law, so long as the statements are voluntary and reliable, see *Oregon* v. *Hass*, 420 U. S. 714 (1975); *Harris* v. *New York*, 401 U. S. 222 (1971).

Petitioner argues that the rationale of these cases is confined to "impeachment" of testimony presented by the defendant himself because these cases involve only "impeachment by self-contradiction." Brief for Petitioner 13. The theory, it seems, is that excluded evidence introduced in opposition to the defendant's testimony impeaches by means of the contradiction itself; the substantive truth or falsity of the suppressed evidence is irrelevant. Our cases do not bear this reading. In *Havens*, the defendant was charged as an accomplice in the smuggling of narcotics. A codefendant hid the drugs in a T-shirt constructed with special pockets. The pockets were made of patches cut from another T-shirt found in the defendant's luggage during an illegal search. When the defendant denied having possessed the T-shirts, the cut

T-shirt, which had been excluded at the outset, was admitted as rebuttal evidence. We upheld its admission. See 446 U. S., at 623, 628. There was no "self-contradiction" involved, for the rebuttal of the defendant's testimony could only have been based on the jury's belief in the substantive truth of the fact that the altered T-shirt was used in the smuggling, and that it belonged to the defendant. The same was true in *Walder*, where we upheld the admission of illegally seized heroin from an unrelated investigation to impeach the defendant's statement that he had never possessed the drug. In sum, our cases show that introduction of testimony contrary to excluded but reliable evidence subjects the testimony to rebuttal by that evidence.

I agree with the majority that the resolution of this case depends on a balance of values that informs our exclusionary rule jurisprudence. We weigh the "'likelihood of . . . deterrence against the costs of withholding reliable information from the truth-seeking process.'" *Ante*, at 312, n. 1 (quoting *Illinois* v. *Krull*, *supra*, at 347). The majority adopts a sweeping rule that the testimony of witnesses other than the defendant may never be rebutted with excludable evidence. I cannot draw the line where the majority does.

The interest in protecting the truth-seeking function of the criminal trial is every bit as strong in this case as in our earlier cases that allowed rebuttal with evidence that was inadmissible as part of the prosecution's case in chief. Here a witness who knew the accused well took the stand to testify about the accused's personal appearance. The testimony could be expected to create real doubt in the minds of jurors concerning the eyewitness identifications by persons who did not know the accused. To deprive the jurors of knowledge that statements of the defendant himself revealed the witness' testimony to be false would result in a decision by triers of fact who were not just kept in the dark as to excluded evidence, but positively misled. The potential for harm to the truth-seeking process resulting from the majority's new rule

in fact will be greater than if the defendant himself had testified. It is natural for jurors to be skeptical of self-serving testimony by the defendant. Testimony by a witness said to be independent has the greater potential to deceive. And if a defense witness can present false testimony with impunity, the jurors may find the rest of the prosecution's case suspect, for ineffective and artificial cross-examination will be viewed as a real weakness in the state's case. Jurors will assume that if the prosecution had any proof the statement was false, it would make the proof known. The majority does more than deprive the prosecution of evidence. The state must also suffer the introduction of false testimony and appear to bolster the falsehood by its own silence.

The majority's fear that allowing the jury to know the whole truth will chill defendants from putting on any defense seems to me far too speculative to justify the rule here announced. No restriction on the defense results if rebuttal of testimony by witnesses other than the defendant is confined to the introduction of excludable evidence that is in direct contradiction of the testimony. If mere "tension with the tainted evidence," *ante*, at 315, opened the door to introduction of *all* the evidence subject to suppression, then the majority's fears might be justified. But in this context rebuttal can and should be confined to situations where there is direct conflict, which is to say where, within reason, the witness' testimony and the excluded testimony cannot both be true.[1]

---

[1] Defining the proper scope of rebuttal is a task that trial judges can be expected to perform without difficulty, for this type of inquiry is a familiar one. In a different context, for example, Federal Rule of Evidence 801(d)(1) provides that a prior statement under oath is not hearsay if "the statement is . . . inconsistent with the declarant's testimony." Likewise, Rule 613(b) contemplates the admission of extrinsic evidence of a "prior inconsistent statement." Trial judges apply these and similar state rules every day, and general formulations of the principles involved are commonplace. For example, the relevant question has been described as whether two statements "cannot at the same time be true . . . . Thus, it is not a mere difference of statement that suffices; nor yet is an absolute oppositeness

Also missing from the majority's analysis is the almost certain knowledge that the testimony immunized from rebuttal is false. The majority's apparent assumption that defense witnesses protected by today's rule have only truthtelling in mind strikes me as far too sanguine to support acceptance of a rule that controls the hard reality of contested criminal trials. The majority expresses the common sense of the matter in saying that presentation of excluded evidence must sometimes be allowed because it "penalizes defendants for committing perjury." *Ante*, at 314.

In some cases, of course, false testimony can result from faulty recollection. But the majority's ironclad rule is one that applies regardless of the witness' motives, and may be misused as a license to perjure. Even if the witness testifies in good faith, the defendant and his lawyer, who offer the testimony, know the facts. Indeed, it is difficult here to imagine the defense attorney's reason for asking Henderson about petitioner's hair color if he did not expect her to cast doubt on the eyewitness identification of petitioner by giving a description of petitioner's hair color contrary to that contained in his own (suppressed) statement.

The suggestion that the threat of a perjury prosecution will provide sufficient deterrence to prevent false testimony, *ante*,

---

essential; it is an inconsistency that is required." 3A J. Wigmore, Evidence § 1040 (J. Chadbourn rev. 1970).

The trial court's handling of the rebuttal in this case provides an illustration. There is no suggestion that the trial court considered witness Jewel Henderson's testimony about petitioner's hair color to be a basis for admitting petitioner's other statements about the shootings. Henderson also testified that she was with petitioner at his home on the night of the shooting, and that petitioner had arrived there between 10 and 11 p.m., but that she could not be specific about the time. The State sought to rebut this testimony with petitioner's suppressed statements about the shooting, contending that Henderson's testimony established an alibi for the shooting, which occurred around 11 p.m. The court concluded that no alibi was established and refused to allow introduction of the suppressed statements on rebuttal. The trial court thus refused to introduce excluded evidence on the basis of mere tension with the witness' statement.

at 314 (opinion of BRENNAN, J.); *ante*, at 320–321 (opinion of STEVENS, J.), is not realistic. See generally *Dunn* v. *United States*, 442 U. S. 100, 108 (1979) (describing proof of perjury as "exceptionally difficult"). A heightened proof requirement applies in Illinois and other States, making perjury convictions difficult to sustain. See *People* v. *Alkire*, 321 Ill. 28, 151 N. E. 518 (1926); *People* v. *Harrod*, 140 Ill. App. 3d 96, 488 N. E. 2d 316 (1986). Where testimony presented on behalf of a friend or family member is involved, the threat that a future jury will convict the witness may be an idle one.

The damage to the truth-seeking process caused by the majority's rule is certain to be great whether the testimony is perjured or merely false. In this case there can be little doubt of the falsity, since petitioner's description of his own hair was at issue. And as a general matter the alternative to rebuttal is endorsement of judicial proceedings conducted in reliance on information known to be untrue. Suppressed evidence is likely to consist of either voluntary statements by the defendant himself or physical evidence. Both have a high degree of reliability, and testimony in direct conflict to such evidence most often will represent an attempt to place falsehoods before the jury.[2]

---

[2] JUSTICE STEVENS takes exception to the "assumption" that the police officer's recollection of James' statement about his hair was reliable. *Ante*, at 321. But one need hardly be credulous to so describe the officer's testimony. James, it must be remembered, said his hair was previously red and straight just after he emerged from the dryer with curlers still in his hair. Moreover, in cases involving the suppression of physical evidence, which the majority's rule must also govern, the reliability of the suppressed evidence itself will not be in question since the evidence is not testimonial. In any event, the issue here is not credibility. Perhaps a jury in this case would also find reasons to be skeptical of the rebuttal testimony. My point is that the factfinder should be given the chance to do so. This will not happen under the majority's approach, by which, as I have said, the verdict will be delivered by jurors who have been misled.

The suggestion that all this is so far beyond the control of the defendant that he will put on no defense is not supported. As to sympathetic witnesses, such as the family friend here, it should not be too hard to assure the witness does not volunteer testimony in contradiction of the facts. The defendant knows the content of the suppressed evidence. Even in cases where the time for consultation is limited, the defense attorney can take care not to elicit contradicting testimony. And in the case of truly neutral witnesses, or witnesses hostile to the accused, it is hard to see the danger that they will present false testimony for the benefit of the defense.

The majority's concerns may carry greater weight where contradicting testimony is elicited from a defense witness on cross-examination. In that situation there might be a concern that the prosecution would attempt to produce such testimony as the foundation to put excluded evidence before the jury. We have found that possibility insufficient to justify immunity for a defendant's own false testimony on cross-examination. *United States* v. *Havens*, 446 U. S. 620 (1980). As to cross-examination of other witnesses, perhaps a different rule could be justified. Rather than wait for an appropriate case to consider this or similar measures, however, the majority opts for a wooden rule immunizing all defense testimony from rebuttal, without regard to knowledge that the testimony introduced at the behest of the defendant is false or perjured.

I also cannot agree that admission of excluded evidence on rebuttal would lead to the "disregard of . . . constitutional rights," by law enforcement officers, *ante*, at 319, that the majority fears. This argument has been raised in our previous cases in this area of the law. See *Havens, supra*, at 633–634 (BRENNAN, J., dissenting); *Hass*, 420 U. S., at 725 (BRENNAN, J., dissenting); *Harris*, 401 U. S., at 232 (BRENNAN, J., dissenting). To date we have rejected it. Now the specter appears premised on an assumption that a single slip of the tongue by any defense witness will open the door to

any suppressed evidence at the prosecutor's disposal. If this were so, the majority's concern that officers would be left with little to lose from conducting an illegal search would be understandable. And the argument might hold more force if, as the majority speculates, *ante*, at 319, police confront the temptation to seize evidence illegally "much if not most of the time" after gathering sufficient evidence to present proof of guilt beyond a reasonable doubt in the case in chief. Again, however, I disagree with the predictions.

It is unrealistic to say that the decision to make an illegal search turns on a precise calculation of the possibilities of rebuttal at some future trial. There is no reason to believe a police officer, unschooled in the law, will assess whether evidence already in his possession would suffice to survive a motion for acquittal following the case in chief. The officer may or may not even know the identity of the ultimate defendant.[3] He certainly will not know anything about potential defense witnesses, much less what the content of their testimony might be. What he will know for certain is that evidence from an illegal search or arrest (which may well be crucial to securing a conviction) will be lost to the case in chief. Our earlier assessments of the marginal deterrent effect are applicable here. "Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made un-

---

[3] In this case, contrary to the impression conveyed by the majority, *ante*, at 319, n. 8, the arresting officers knew almost nothing of the state of a future prosecution case. The officers did know there were several eyewitnesses to the shooting. But these eyewitnesses had made no identification of any suspect. The officers did not know petitioner's real name or his true appearance, but had sought him out at the beauty parlor on an anonymous tip. They could not know what physical evidence, such as the murder weapon, they might find on petitioner, or might lose to the case in chief as a result of illegal conduct. The suggestion that the officers' calculated assessment of a future trial allowed them to ignore the exclusionary rule finds no support in the record and, in fact, is pure speculation.

available to the prosecution in its case in chief." *Harris, supra,* at 225.

In this case, the defense witness, one Jewel Henderson, testified that petitioner's hair was black on the date of the offense. Her statement, perjured or not, should not have been offered to the jurors without giving them the opportunity to consider the unequivocal and contradicting description by the person whose own hair it was. I would allow the introduction of petitioner's statement that his hair was red on the day of the shootings. The result is consistent with our line of cases from *Walder* to *Havens* and compelled by their reasoning.

The prosecution, it is true, did not limit itself to petitioner's description of his hair color. It went beyond this to introduce petitioner's statement that he went to the beauty shop to "change his appearance." App. 11. The prosecutor used this statement to suggest that petitioner had a guilty mind and an intention to evade capture by disguise. This goes beyond what was necessary to rebut Henderson's testimony and raises many of the concerns expressed in the majority opinion. Nonetheless, there was overwhelming evidence of petitioner's guilt in this case, including the testimony of five eyewitnesses. In view of these circumstances, I agree with the Illinois Supreme Court that any error as to the additional statements or the prosecutor's argument had no effect on petitioner's trial and may be considered harmless.

Where the jury is misled by false testimony, otherwise subject to flat contradiction by evidence illegally seized, the protection of the exclusionary rule is "'perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.'" *Havens, supra,* at 626 (quoting *Harris, supra,* at 226). The perversion is the same where the perjury is by proxy. I would affirm the judgment of the Illinois Supreme Court.