**Harold W. KUNTZ, Petitioner,**

v.

**Gary R. McCAUGHTRY, Respondent.**

**Civ. A. No. 91–C–869.**

United States District Court,
E.D. Wisconsin.

Nov. 24, 1992.

Charles Bennett Vetzner, Office of State Public Defender, Madison, Wis., for petitioner.

Sally L. Wellman, Asst. Atty. Gen., Madison, Wis., for respondent.

## ORDER

TERENCE T. EVANS, Chief Judge.

Petitioner Harold W. Kuntz is presently imprisoned at Waupun Correctional Institution. He has filed this petition for a writ of habeas corpus on two grounds: (1) that a confession obtained in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), *reh'g denied* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984, was admitted as substantive evidence of guilt against him during his state court trial; and (2) that the prosecution was relieved of proving an element of the arson charge. Mr. Kuntz has unsuccessfully sought relief on these issues in state court. The Wisconsin Supreme Court resolved both issues on a finding of harmless error. Mr. Kuntz has not taken issue with the facts found by the Wisconsin Supreme Court when considering his case. Assuming those facts to be true, the following tragedy unfolded on March 1, 1987.[1]

Harold Kuntz's estranged wife, Karen Kuntz, and two of her daughters were living in the Twin Oaks Trailer Court near Whitewater, Wisconsin. As Mrs. Kuntz returned to the trailer park at about 10 p.m., she saw Mr. Kuntz's pickup truck with its light off near the park entrance; she recognized Mr. Kuntz as the driver. Mrs. Kuntz entered her mobile home to find a fire burning inside. The back door of the locked trailer had been pried open and fires had been deliberately set in two areas of the bedroom. Her daughter, Sandy Bower, was found unconscious on the floor near the front door, her eyes blackened and her head bleeding. She had suffered ten wounds on her skull inflicted with a blunt instrument with a thin wedge point. She died from those injuries 18 days later.

---

1. More detailed facts can be found in *State v. Kuntz*, 160 Wis.2d 722, 467 N.W.2d 531 (1991).

Shortly before the fire Mr. Kuntz had threatened Karen saying that he would destroy everything she owned and kill her children if she went through with a divorce. The most recent threat had come less than a week before. Several other witnesses at numerous times had heard Mr. Kuntz threaten harm to Mrs. Kuntz's property and children. Mrs. Kuntz had seen Mr. Kuntz's truck drive past her trailer four or five times about a week prior to the fire. Her answering machine had picked up a telephone call from Mr. Kuntz at approximately 9 p.m. on the night of the fire.

Mr. Kuntz was tried before a jury in Jefferson County circuit court for the offenses of first degree murder in violation of Wisconsin Statute § 940.01, arson to a building in violation of section 943.02(1), and committing a battery during a burglary in violation of section 943.10(2). He testified on his own behalf at trial and admitted that he drove to the trailer court on March 1 around 10 p.m. He claimed to have merely driven by the trailer without stopping because Mrs. Kuntz's car was not there. After five days of trial the jury found him guilty of the three counts, and on October 28, 1987, Judge Arnold K. Schumann sentenced Mr. Kuntz to life on the count of murder plus two 20–year consecutive sentences on the other offenses.

On appeal, after the Wisconsin Supreme Court refused certification, the Wisconsin Court of Appeals reversed the arson conviction and affirmed the convictions for first degree murder and burglary/battery. The Wisconsin Supreme Court subsequently reinstated the arson conviction and affirmed the other two counts. *See State v. Kuntz*, 160 Wis.2d 722, 467 N.W.2d 531 (1991). Mr. Kuntz moved for reconsideration of the decision. The Supreme Court denied the motion but amended its opinion.

## THE CONCLUSIVE PRESUMPTION

■ The arson statute under which Mr. Kuntz was convicted, Wis.Stat. § 943.-02(1)(a), requires the state to prove that a building has been damaged by fire. That statute, though, does not define "building." While instructing the jury on this offense, Judge Schumann told the jury that "[a] mobile home is a building." Mr. Kuntz contends that Judge Schumann's instruction was an impermissible mandatory conclusive presumption that required the jury to find that the state had proved that a building had been damaged by fire if it found that the structure damaged was a mobile home.

The due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of *every fact* necessary to constitute the crime with which he is charged." *Sandstrom v. Montana*, 442 U.S. 510, 520, 99 S.Ct. 2450, 2457, 61 L.Ed.2d 39 (1978) (quoting *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970)). This "bedrock" principle prohibits the state from using evidentiary presumptions in a jury charge that have the effect of relieving the state of its burden of persuasion beyond a reasonable doubt on each essential element of a crime. *Francis v. Franklin*, 471 U.S. 307, 313, 105 S.Ct. 1965, 1970, 85 L.Ed.2d 344 (1985).

The threshold inquiry in this type of analysis is to determine whether the challenged portion of the instruction creates a "mandatory presumption" or merely a "permissive inference," focusing on the specific language challenged as well as the jury charge as a whole. *Franklin*, 471 U.S. at 313–15, 105 S.Ct. at 1970–71. A permissive inference suggests to the jury a possible conclusion to be drawn if the state proves predicate facts, but does not require that conclusion. A mandatory presumption instructs the jury that it must infer the presumed fact if the state proves certain predicate facts. *Id.* at 314, 105 S.Ct. at 1971. A mandatory presumption may be either conclusive or rebuttable. A conclusive presumption removes the presumed element from the case once the state has proved those predicate facts. A rebuttable presumption requires the jury to find the presumed element unless the defendant persuades the jury that such a finding is unwarranted. *Id.* at 314 n. 2, 105 S.Ct. at 1971 n. 2; *Sandstrom*, 442 U.S. at 517–518, 99 S.Ct. at 2456. Mandatory conclusive presumptions are impermissible because in

addition to overriding the presumption of innocence, such presumptions invade the jury's fact-finding function.[2] *Carella v. California*, 491 U.S. 263, 264, 109 S.Ct. 2419, 2420, 105 L.Ed.2d 218 (1989), *reh'g denied*, 492 U.S. 937, 110 S.Ct. 23, 106 L.Ed.2d 636.

The requirement that a building be damaged by fire is clearly an essential element of section 943.02(1)(a). Indeed, it is the key difference between that crime and the lesser crime of section 943.03, which covers arson to property other than buildings. The Wisconsin Supreme Court agreed that the instruction "[a] mobile home is a building" was a mandatory conclusive presumption regarding an element of the arson charge:

> Proof of the predicate fact that a mobile home has been damaged by fire requires the jury to conclusively presume that an element of the arson offense has been proved. The instruction as a whole did not negate this conclusive presumption.

*Kuntz*, 160 Wis.2d at 737–38, 467 N.W.2d 531. The parties do not dispute this holding. They instead contest what effect this finding should have.

The level of harmless-error analysis applicable to mandatory conclusive presumptions is not exactly clear. Although the main opinion was only joined by a plurality, at least eight justices in *Connecticut v. Johnson*, 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983), believed that at least some type of harmless error analysis was applicable to mandatory conclusive presumption errors. The plurality concluded that the harmless-error analysis should be more strict than the *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), standard:

> An erroneous presumption on a disputed element of a crime renders irrelevant the evidence on the issue because the jury may have relied upon the presumption rather than upon that evidence. If the jury may have failed to consider evidence of intent, a reviewing court cannot hold that the error did not contribute to

the verdict. The fact that the reviewing court may view the evidence of intent as overwhelming is then simply irrelevant. To allow a reviewing court to perform the jury's function of evaluating the evidence of intent, when the jury never may have performed that function, would give too much weight to society's interest in punishing the guilty and too little weight to the method by which decisions of guilt are to be made.

*Id.* 460 U.S. at 85–86, 103 S.Ct. at 977 (footnotes and citations omitted). Four justices, however, found the *Chapman* standard adequate, believing the plurality's view to be essentially equivalent to an automatic reversal rule. *See Johnson*, 460 U.S. at 93–102, 103 S.Ct. at 980–985 (Powell, J., dissenting).

In *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), though, a Court majority, led by Justice Powell, affirmatively rejected any automatic reversal standard, holding that the *Chapman* harmless-error standard should apply instead.

In *Carella*, a plurality indicated that the harmless-error rule is indeed applicable to a *Sandstrom* error, but gave little instruction on that analysis, remanding the case for the state to determine the issue. *Carella*, 491 U.S. at 266, 109 S.Ct. at 2421. In an opinion concurring in the judgment, Justice Scalia, joined by Justices Brennan, Marshall, and Blackmun, indicated "what should be made explicit": that the inquiry applicable to mandatory presumptions is unlike typical harmless-error analysis.

> In the usual case the harmlessness determination requires consideration of "the trial record as a whole," in order to decide whether the fact supported by improperly admitted evidence was in any event overwhelmingly established by other evidence. Such an expansive inquiry would be error here....

491 U.S. at 269, 109 S.Ct. at 2421 (Scalia, J., concurring) (citations omitted). Rejecting *Rose*'s application of the usual *Chapman* standard, Justice Scalia stated that in cases of mandatory conclusive presumptions, the

---

2. "A mandatory rebuttable presumption is perhaps less onerous from the defendant's perspective, but it is no less unconstitutional." *Franklin*, 471 U.S. at 317, 105 S.Ct. at 1973.

"problem [is] not [ ] cured by an appellate court's determination that the record evidence *unmistakably* established guilt, for that would represent a finding of fact by judges, not by a jury." *Carella,* 491 U.S. at 269, 109 S.Ct. at 2422 (Scalia, J., concurring).

Although the *Rose* case dictates the *Chapman* standard, both the *Johnson* plurality and the four concurring justices in *Carella*—the most recent case—believed that the use of conclusive presumptions could be harmless error only in those " 'rare situations' when 'the reviewing court can be confident that [such an] error did not play any role in the jury's verdict.' " *Carella,* 491 U.S. at 270, 109 S.Ct. at 2423 (Scalia, J., concurring) (quoting *Johnson,* 460 U.S. at 87, 103 S.Ct. at 977). Justice Scalia set forth three instances where the error could be harmless. Echoing the main plurality opinion in *Johnson,* the first two instances concern an instruction establishing a conclusive presumption on a charge of which the defendant was acquitted and an instruction establishing a conclusive presumption with regard to an element of the crime that the defendant in any case admitted. *Carella,* 491 U.S. at 270, 109 S.Ct. at 2423 (Scalia, J., concurring); *Johnson,* 460 U.S. at 87, 103 S.Ct. at 977. The third instance, echoing a portion of *Rose,* occurs

> [w]hen the predicate facts relied upon in the instruction, or other facts necessarily found by the jury, are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is functionally equivalent to finding the element required to be presumed.

*Carella,* 491 U.S. at 271, 109 S.Ct. at 2423 (Scalia, J., concurring). In this last instance, the error is harmless because it is beyond a reasonable doubt that the jury found the facts necessary to support the conviction. *Id.*

The Wisconsin Court of Appeals ordered a new trial for Mr. Kuntz on the arson count, determining that the instruction in effect directed the verdict on an element of the crime, relieving the state of its burden. "Such an error can never be considered harmless," said that court, citing *State v. Leist,* 141 Wis.2d 34, 39, 414 N.W.2d 45 (App.1987). The Wisconsin Supreme Court reversed because it found that the mandatory conclusive presumption did not play any role in the jury's verdict. Following Justice Scalia's concurring opinion in *Carella,* the Wisconsin Supreme Court found that "this case presents the rare situation in which a conclusive presumption regarding an element of the crime is harmless error." *Kuntz,* 160 Wis.2d at 730, 735, 467 N.W.2d 531. According to the Wisconsin Supreme Court,

> [t]he instruction did not play any role in the jury's findings of fact regarding its conclusion that the structure damaged by fire was a building. The jury was instructed that "[a] mobile home is a building"; it was not instructed that "a mobile home is a building and this structure was a mobile home." It remained for the jury to find that the structure in question was a mobile home.
>
> We conclude that no rational jury could plausibly find that the structure in question was a mobile home without also finding that the structure was a building ....
>
> The evidence, which included photographs of the structure and testimony that there was a permanent porch affixed to the trailer, supports the jury's finding that this structure was a mobile home and not something else such as a motor home. Under these circumstances, we are confident that the mandatory conclusive presumption did not play any role in the jury's verdict and the instruction was, therefore, harmless error.

*Id.* at 740–41, 467 N.W.2d 531.

Under either the *Chapman* standard or the *Carella* analysis, Mr. Kuntz's claim cannot pass the harmless-error test. Under the *Chapman* standard, to be harmless error, the prosecutor must prove beyond a reasonable doubt that the constitutional error did not contribute to the guilty verdict. *Burns v. Clusen,* 798 F.2d 931, 943 (7th Cir.1986). In the context of trial, the issue is whether absent the forbidden error, hon-

est and fair-minded jurors might well have brought a not guilty verdict. *Id.* As pointed out by the Wisconsin Supreme Court, photographs of the structure and testimony that a permanent porch was attached were presented to the jury. The mobile home was located in a residential trailer park. Moreover, Mr. Kuntz's case differs from the Supreme Court cases cited here in a very important way: In the Supreme Court cases, the challenged jury instruction regarded *the* contested issue at trial (intent), while in Mr. Kuntz's case, whether a mobile home constituted a building apparently was never an issue at all. In closing arguments, neither attorney ever discussed that element as being in dispute. Absent the forbidden error, with these facts, honest jurors would not have brought a not guilty verdict.

Under Justice Scalia's more narrow *Carella* analysis, the Wisconsin Supreme Court correctly found that the predicate fact ("mobile home") was so closely related to the ultimate fact ("building") that finding the predicate fact was functionally equivalent to finding the ultimate fact. Webster's Third International Dictionary (1976) defines "building" as

> a constructed edifice designed to stand more or less permanently, covering a space of land, usu[ally] covered by a roof and more or less completely enclosed by walls, and serving as a dwelling ... or other useful structure—distinguished from structures not designed for occupancy ... and from structures not intended for use in one place ... even though subject to occupancy.

"Mobile home" has been defined as "a large house trailer, designed for year-round living in one place," Webster's College Dictionary (1991), and "a house trailer that is used as a permanent home and is usually hooked up to utilities," American Heritage Dictionary (2d ed. 1982). Definitions of "building" in other sections of the Wisconsin Statutes specifically include mobile homes, Wis.Stat. §§ 941.20(1)(d) (use of a dangerous weapon), 101.125(1)(a) (safety glazing in hazardous locations), or could be construed to include them, Wis.Stat. §§ 66.-05(4) and (8)(a) (razing buildings) and 66.-501(b) (hospital facilities). Mr. Kuntz contends that because the house trailer may sometimes be transported down the street, that the terms are not functionally equivalent. These definitions, though, show that mobile homes are a subset of buildings. I am convinced that no rational jury could plausibly find that the structure was a mobile home without also finding that it was a building.

## ADMISSION OF THE STATEMENT

Shortly after his arrest on March 2, Mr. Kuntz was taken to an interview room at the jail and given *Miranda* warnings. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Mr. Kuntz stated that he did not want to talk, that he had a lawyer, and that he wanted to go back to his cell.[3] About 4 hours later, the same officer took Mr. Kuntz back to the interview room and began interrogating him. Although the *Miranda* warnings were not repeated, Mr. Kuntz may have indicated that he understood his rights. Mr. Kuntz then detailed his activities of the prior night, admitting, among other things, that he went to the home of Beverly Salmon and told her that he wanted to take a ride in her car and that he wanted her to drive.

For purposes of argument at trial, on appeal, and here, the government has assumed that the interrogation constituted a violation of Mr. Kuntz's rights to silence and counsel under *Miranda* and *Edwards.* At trial, the state claimed that it only sought to use the statement for impeachment purposes. Finding the statement voluntary and trustworthy, Judge Schumann allowed the statement to be admitted for impeachment purposes under *Wold v. State,* 57 Wis.2d 344, 204 N.W.2d 482 (1973), and *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Mr. Kuntz concedes that if the statements were

---

**3.** There is some dispute about whether Mr. Kuntz refused to talk because of his right to counsel or because he was tired and hung over.

made voluntarily, they could be used for impeachment of his own trial testimony. *See Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). But, as his second ground in his petition, he claims that the statement was allowed in as substantive evidence rather than as impeachment material and that its admission violated the principle of *James v. Illinois*, 493 U.S. 307, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990).

Both Salmon and Mr. Kuntz testified at the trial. Salmon testified on behalf of the prosecution that she had arrived home shortly after 10 p.m. on March 1 to find Mr. Kuntz waiting in his truck in her driveway. She testified that she had asked Kuntz to get into her car. The examination then proceeded as follows:

Q: What conversation did you have,— what did Mr. Kuntz say and what did you say?

. . . .

A: And I said what—I kind of asked him what he wanted to do, and he wanted to go check on the lottery tickets because they had, you know, the lottery had rolled over a few times.

Q: Did you—Before you got to the discussion of the lottery, did you say that you were going to take a drive?

A: Mm-hmm (indicating affirmative response).

Q: And after that—

A: He asked me if I wanted to go for a ride, and I said: Why not.

On cross-examination, Salmon testified as follows:

Q: ... You indicate you took the back roads when you headed to Illinois. Why did you take back roads?

A: I didn't know. I just chose to take back roads.

Q: Did Harold tell you, listen—

A: No, Harold had nothing to do with it, I'm the one that suggested it. I go the back roads many places many times.

Salmon and Mr. Kuntz drove on back roads to Roscoe and South Beloit, Illinois, and Milwaukee before returning to her home at about 4 a.m. Sometime during the trip, Mr. Kuntz apparently lost or disposed of his boots.

While cross-examining Mr. Kuntz, the state elicited his statement to the police that he had suggested the drive. In her closing argument, the prosecutor contended that Mr. Kuntz contacted Salmon that night as part of a plan to create an alibi, get rid of incriminating evidence, and flee the scene of the crime. Mr. Kuntz asserts that the state's argument is much weaker if, as Salmon testified at the trial, it was she who first proposed taking the drive.

In the Wisconsin Court of Appeals, Mr. Kuntz argued that the illegally obtained statement about the drive did not impeach his own direct testimony and therefore could not be used against him. He added that "[i]f the statement in question impeached anyone, it was Salmon, not [him]." The court of appeals determined that the evidence was properly admissible because it impeached Salmon's trial testimony.

In light of the court of appeals decision, the parties both read Salmon's testimony to mean that she was the one who first suggested taking the drive. Mr. Kuntz then argued to the Wisconsin Supreme Court that the court of appeals' decision was contrary to *James*, in which the United States Supreme Court held that an illegally obtained statement could not be used to impeach any defense witness other than the defendant himself. The Wisconsin Supreme Court avoided analysis of the *James* ruling in regard to a prosecution witness by finding that the admitted statement did not impeach Salmon's trial testimony at all: "The crucial piece of information concerns who wanted to take a ride. Both Salmon's testimony and the defendant's illegally obtained statement acknowledge that Kuntz suggested they go for a ride." *Kuntz*, 160 Wis.2d at 744, 467 N.W.2d 531.

Mr. Kuntz sought reconsideration, pointing out the incongruity: if the statement did not impeach anyone, then it was unlawfully admitted into evidence in the first place because it was admitted for its direct, substantive evidence of guilt. In denying rehearing, the Wisconsin Supreme Court modified its original decision with the fol-

lowing language, dismissing the admission as harmless:

> Nor can it be said that Kuntz's illegally obtained statement carried any weight as direct evidence. Kuntz, in his direct testimony, indicated that the first thing he had said to Salmon was, "Hi, how about going for a ride and check out the [lottery] numbers." At most the direct evidence provided by Kuntz's illegally obtained statement was cumulative. Any error was harmless beyond a reasonable doubt.

*Kuntz,* 160 Wis.2d at 744, 467 N.W.2d 531 (as modified).

■ Evidence that has been illegally obtained "is inadmissible on the government's direct case, or otherwise, as substantive evidence of guilt." *United States v. Havens,* 446 U.S. 620, 628, 100 S.Ct. 1912, 1917, 64 L.Ed.2d 559 (1980). Under *Havens,* use of an illegal statement is thus prohibited during any part of the state's case, even if used to impeach its own witness. If impeachment of other *defense* witnesses by use of an illegally obtained statement is prohibited, as it is under *James,* use of the statement to impeach *prosecution* witnesses is foreclosed a *fortiori.* The Court's concern in *James* was the chilling effect on presentation of other defense witnesses. That concern about a fair trial is magnified in regard to prosecution witnesses. Allowing the prosecution to use the illegal statement during the presentation of its case—even if used to impeach its own witness—would virtually negate the exclusionary rule altogether. The prosecution would have free reign to present witnesses just for their impeachment value in order to get the illegal statement before the jury. Although defendants should not be able to " 'pervert' the exclusion of illegally obtained evidence into a shield for perjury, ... it seems no more appropriate for the State to brandish such evidence as a sword...." *James,* 493 U.S. at 317, 110 S.Ct. at 654.

■ The considerations by the *James* Court against extending the impeachment exception to other defense witnesses are even more apparent in regard to prosecution witnesses: threat of a subsequent criminal prosecution for perjury is sufficiently likely to deter a witness other than a defendant from lying, and other witnesses will not share the defendant's concern for avoiding statements that invite impeachment—even "friendly" witnesses may subject themselves to impeachment by insufficient attentiveness, let alone opposition witnesses. Furthermore, the state's proposed expansion of the impeachment exception would significantly weaken the exclusionary rule's deterrent effect on police misconduct. *James,* 493 U.S. at 317, 110 S.Ct. at 654.

> So long as we are committed to protecting the people from the disregard of their constitutional rights during the course of criminal investigations, inadmissibility of illegally obtained evidence must remain the rule, not the exception.

*James,* 493 U.S. at 319, 110 S.Ct. at 655. Thus, under the rules and reasoning of *Harris* and *James,* impeachment use of an illegal statement is allowed against the defendant alone. *James,* 493 U.S. at 320, 110 S.Ct. at 655–56.

■ Whether Mr. Kuntz's statement to the police contradicts Salmon's testimony or not, its admission was constitutionally improper. If, as the Wisconsin Supreme Court believed, it did not impeach *anyone* on this point, then the statement was unconstitutionally admitted.[4] And, if the statement contradicted *Salmon,* it violated *James.* In this case, the statement's clear use by the prosecutor as substantive evidence is apparent from her closing statement. The prosecutor did not argue that Salmon's testimony could not be trusted. Instead, she used the statement to argue that Mr. Kuntz went to Salmon's house and suggested the drive to create an alibi, thus using his statement *for its truth.*

Nonetheless, admission of the illegally obtained statement is subject to traditional harmless error analysis. The pertinent portion of the statement, which was elicited

---

**4.** Even the state does not agree with the Wisconsin Supreme Court's conclusion that the illegally obtained statement did not impeach Salmon's trial testimony. Brief in opposition at 11 n. 5.

on cross-examination, was cumulative of Mr. Kuntz's own prior testimony. On direct examination of Mr. Kuntz, the following colloquy occurred:

Q: Okay. What if anything did you say to Bev when you pulled in, or when you talked to her?

A: You mean when I was walking down by her car?

Q: What was the first thing you said to her that evening after you got to her place?

A: Well, I said, Hi, I says, How about going for a ride and check out the numbers.

In regard to who suggested the drive, the Kuntz statement to the police added nothing new.

Mr. Kuntz argues that the evidence against him was "hardly overwhelming" and that the evidence in question was "not peripheral" to the prosecution's case. According to Mr. Kuntz, the state's case was built almost exclusively on his being sighted in the vicinity of the crime and on the several verbal threats he made during the prior 8–month period. In addition, the illicit statement "from the petitioner's own lips" had particularly persuasive power with the jury.

The state had, however, much more in its bag of evidence than that. For instance, several of the threats had come just prior to the crime. The threats had been heard by many people and were not merely of general harm; several were statements that he would destroy her property and kill her children—exactly what happened. There was no ransacking or evidence of anything missing from the trailer—just deliberate destruction and death. He had been seen near the trailer park several times the week prior to the tragedy. He had said that if he could not have Karen, no one would. She was apparently dating someone else and the fires were deliberately set in her bedroom. On the night of March 1–2, Mr. Kuntz had done several suspicious things like driving with the headlights turned off until he was on the main highway near the trailer park, taking the magnetic advertising signs off his pick-up truck, wearing a coat from which he had recently ripped off exterior name tags, and losing or disposing of his boots, all potential acts of trying to hide his identity or whereabouts. Although not identifiable as the victim's, fresh human blood was found on his pants leg. Although not completely identifiable as the victim's, a hair found in his pickup truck matched several characteristics of Sandy Bower's hair. His pickup truck had numerous tools that could have been used to pry open a door and kill Sandy Bower.

Combining the cumulative nature of the statement with the great amount of evidence against Mr. Kuntz—even though circumstantial—the admission of this portion of his illegally obtained statement constitutes harmless error.

The petition for writ of habeas corpus is DENIED and this case DISMISSED.

SO ORDERED.