The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
October 24, 2019

## 2019COA159

**No. 16CA0152, *People v. Johnson* — Constitutional Law — Fourth Amendment — Searches and Seizures — Warrantless Search — Exclusionary Rule — Impeachment Exception**

The division considers the limits of the impeachment exception to the exclusionary rule announced in *Walder v. United States*, 347 U.S. 62 (1954), and limited in *James v. Illinois*, 493 U.S. 307 (1990). Under this rule, evidence that was suppressed as unconstitutionally obtained may nevertheless be admissible under certain limited circumstances. The majority holds that the trial court erred in ruling that the use of truthful testimony about an alternate suspect's positive test for gunshot residue would open the door to the otherwise suppressed evidence of the defendant's positive test. The partial dissent would hold that the trial court

appropriately ruled that the evidence of defendant's test would be admissible to prevent the defense from misleading the jury.

COLORADO COURT OF APPEALS                                    2019COA159

Court of Appeals No. 16CA0152
Arapahoe County District Court No. 14CR2330
Honorable Michelle A. Amico, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Elmo Jesse Johnson,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE TOW
Berger, J., concurs
Taubman, J., concurs in part and dissents in part

Announced October 24, 2019

Philip J. Weiser, Attorney General, Megan C. Rasband, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Stephen C. Arvin, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Elmo Jesse Johnson, successfully sought exclusion of evidence improperly seized without a warrant. However, in granting the motion to suppress, the trial court informed Johnson that if he offered in his defense similar evidence related to an alternate suspect, the prosecution would be permitted to present the suppressed evidence to the jury. In this matter of first impression, we are asked to explore the limits of the impeachment exception to the exclusionary rule: specifically, whether Johnson, in offering truthful testimony that might nevertheless mislead the jury in the absence of the suppressed evidence, opened the door to the otherwise inadmissible evidence. We answer that question "no." As a result, we reverse his conviction for first degree murder, and remand for a new trial on that charge. Because the error did not affect Johnson's conviction for felony menacing, we affirm that conviction.

## I.    Background

¶ 2    Danielle Griego, Johnson's girlfriend, was shot to death in the apartment Johnson shared with his sister, Toni Carrethers, and Carrethers's husband. Hours after Griego's murder, Griego's mother discovered Griego's body on the couch. Johnson lay next to

1

her, unconscious due to alcohol and drugs. Griego's mother called 911. Before law enforcement officers arrived, Carrethers picked up two shell casings that were near Griego's body, rinsed them, and returned them to where she had found them.

¶ 3    Johnson was transported to the hospital. Once there, and while Johnson remained unconscious, officers collected swabs from his hands and face. These swabs ultimately tested positive for gunshot residue (GSR).[1] The officers also collected ammunition from his pants pocket. In addition, they found Griego's blood on his clothing. After regaining consciousness, Johnson denied killing Griego.

¶ 4    Before trial, Johnson moved to exclude the GSR evidence collected from him without a warrant.[2] The trial court granted the motion.[3] In doing so, however, it noted that it would not permit

---

[1] Both Carrethers and Griego's mother also tested positive for GSR.
[2] Johnson also moved to exclude the evidence that his clothing collected by the police at the hospital contained ammunition and was stained with Griego's blood. The trial court denied this motion. Johnson does not challenge that ruling on appeal.
[3] The trial court noted, based on its experience and knowledge, that GSR evidence is the type of evidence that likely falls within the exigent circumstances exception. However, the court observed that it could neither impute its own knowledge into the case nor take

Johnson "to use the Fourth Amendment as both a shield and a sword." The trial court warned Johnson that, should he offer evidence that Carrethers tested positive for GSR, he would open the door for the prosecution to admit Johnson's positive test. The trial court explained that it was concerned about "misleading the jury into believing that either and/or both [Johnson] was never tested or he was not positive."

¶ 5 At trial, Carrethers testified that Griego and Johnson slept that night on Carrethers's couch. She explained that while she was in bed with her husband in the middle of the night, she awoke to hear Griego say, "Oh my God, what are you doing?" Johnson replied, "Shut up," and Carrethers heard two gunshots. Neither Carrethers nor her husband left their room to determine what had happened. Carrethers told police that she did not check the couch the next morning before leaving the home to run errands.

---

judicial notice of the ephemeral nature of GSR evidence. So, because the prosecution had presented no evidence at the motions hearings that would establish that GSR can be easily and quickly destroyed, the trial court concluded it could not apply the exigent circumstances exception to the warrant requirement. The People did not challenge that ruling.

¶ 6     Two male witnesses, Eli Eva and Anthony Pasquale, who had been with Griego earlier on the day of the murder, testified that when Johnson had found Griego with them, he pointed a gun at them, asked if they were sexually involved with Griego, and threatened to kill them.  They testified that he also told Griego, "if I can't have you, bitch, nobody will."  After hearing this, the two witnesses flagged down police officers and Griego called 911.  Law enforcement officers were not able to locate Johnson at that time.

¶ 7     Police officers testified that, during their investigation, they heard Carrethers tell her daughter, "Elmo killed Danny."  They also described observing bullet holes, casings, and ammunition near the body, and finding a handgun hidden in the couch.

¶ 8     The jury found Johnson guilty of first degree murder in the death of Griego.  The jury also convicted Johnson of felony menacing for pointing the gun at Eva.  Johnson now challenges both convictions.  Specifically, he asserts the trial court erred in three ways: (1) by ruling that he could not admit the evidence that Carrethers tested positive for GSR without opening the door to the prosecution offering the otherwise suppressed evidence of Johnson's GSR test; (2) by excluding evidence that Carrethers later

killed her husband; and (3) by permitting Carrethers to testify to several statements made by Griego.

## II. The Trial Court Erred by Ruling That Admission of Evidence of Carrethers's GSR Test Would Open the Door to Johnson's Suppressed GSR Evidence

¶ 9    Johnson contends that the trial court improperly required him to choose between exercising two constitutional rights — the right to present a complete defense and the right to exclude evidence seized in violation of the Fourth Amendment.  Under the circumstances of this case, we agree.

### A.    Standard of Review

¶ 10    We review a trial court's determination that a party's actions have opened the door to otherwise inadmissible evidence for an abuse of discretion.  *People v. Lesney*, 855 P.2d 1364, 1366-67 (Colo. 1993).  A trial court abuses its discretion if it misconstrues or misapplies the law or otherwise reaches a manifestly arbitrary, unreasonable, or unfair result.  *People v. Melillo*, 25 P.3d 769, 773 (Colo. 2001).

¶ 11    A trial court's application of the legal standard in a suppression ruling is a question of law that we review de novo.  *See People v. Smith*, 40 P.3d 1287, 1290 (Colo. 2002).  Similarly, "a trial

5

court's interpretation of a statute or rule governing the admissibility of evidence is reviewed de novo." *People v. Salas*, 2017 COA 63, ¶ 30 (citing *People v. Hill*, 228 P.3d 171, 173 (Colo. App. 2009)).

¶ 12　　The People assert that Johnson either waived or invited this error, and thus we should not review it. Specifically, the People assert that because Johnson never offered the evidence of Carrethers's positive GSR test, no inadmissible evidence was admitted nor was Carrethers's admissible GSR test excluded. Thus, the People argue, no evidentiary error occurred. Essentially, the People argue that the trial court never actually ruled on the issue, but rather merely gave Johnson an advisory warning as to what might happen if he sought to admit certain evidence. We disagree.

¶ 13　　When the trial court initially ruled, Johnson objected, arguing that the trial court was forcing him to choose between enforcing his right to be free from unreasonable searches and his right to present a complete defense. At trial, the court revisited the issue, indicating that it was not precluding inquiry into the GSR issue and reiterating that the door would only be opened "if the nature of their inquiry was misleading, i.e., [Johnson] wasn't positive or the investigation was subpar, he wasn't tested." Johnson's counsel

made an offer of proof as to what testimony he would seek to offer and what he would (and would not) argue to the jury. The next morning, the trial court announced that it was treating Johnson's request as a motion in limine and ruled that, should the defense proceed in that manner, it would open the door to the previously submitted evidence. The trial court concluded, "So defense now is on notice of what the Court's ruling is and can make a decision about whether or not to introduce that."

¶ 14     Johnson's counsel reiterated his prior objections, that the trial court was impermissibly forcing Johnson to make a Hobson's choice between excluding constitutionally inadmissible evidence or foregoing constitutionally permissible and potentially exculpatory evidence. Based on the trial court's ruling, Johnson elected not to offer the evidence of Carrethers's GSR test. In these circumstances, we cannot conclude that the trial court's ruling was merely advisory. Nor, in our view, did Johnson waive or abandon his objections to the trial court's ruling merely by abiding by it. Thus, we conclude that the issue is properly before us.

¶ 15     Because Johnson preserved this issue, and it is of constitutional dimension, any error will require reversal unless it

was harmless beyond a reasonable doubt. *Krutsinger v. People*, 219 P.3d 1054, 1058 (Colo. 2009). To avoid reversal, the prosecution must establish that there is no reasonable possibility that the error might have contributed to the conviction. *Hagos v. People*, 2012 CO 63, ¶ 11.

### B. Applicable Law

¶ 16 "Ordinarily, when police obtain evidence in violation of the Fourth Amendment, that evidence may not be introduced against the aggrieved individual in either a state or federal criminal prosecution." *People v. Gutierrez*, 222 P.3d 925, 941 (Colo. 2009) (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)). However, this rule, known as the exclusionary rule, is not without exceptions. One such exception is known as the impeachment exception, recognized in *Walder v. United States*, 347 U.S. 62 (1954).

¶ 17 In *Walder,* the defendant was prosecuted for multiple counts of distribution of narcotics. *Id.* at 63. A couple of years earlier, the defendant had faced a narcotics possession charge, but that case was dismissed after a court ruled that the drugs had been illegally seized by the police. *Id.* at 62-63. While testifying at his trial on the later distribution charges, the defendant denied ever possessing

8

any narcotics in the past. *Id.* at 63. On cross-examination, over the defendant's objection, the prosecution inquired about the defendant's prior possession charge. *Id.* at 64. The defendant denied that any narcotics had been found on him in that case. *Id.*

¶ 18    In rebuttal, the prosecution was permitted to present the testimony of one of the officers who had been involved in the prior unconstitutional seizure of the narcotics and of the chemist who had analyzed the improperly seized contraband. *Id.* The defendant was convicted and appealed, arguing that admission of the previously excluded evidence violated his constitutional right to be free from unreasonable searches and seizures. *Id.*

¶ 19    The United States Supreme Court rejected the defendant's challenge. The Court observed:

> It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.

*Id.* at 65. The Court ruled that the prior constitutional violation would not provide justification "for letting the defendant

affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility." *Id.*

¶ 20    The Supreme Court later revisited this exception, providing clarity and boundaries to its application. In *James v. Illinois*, 493 U.S. 307 (1990), the defendant, a suspect in a murder, was arrested while sitting under a hair dryer in his mother's beauty parlor. *Id.* at 309. When he was arrested, his hair was black and curly. *Id.* However, he told the officers that the previous day (the day of the murder) his hair had been reddish brown, long, and straight (which matched the description witnesses had provided of the murderer). *Id.* at 309-10. He also told them that he had gone to the beauty parlor to change his appearance. *Id.* at 309.

¶ 21    Before trial, the trial court ruled that the officers had lacked probable cause to arrest the defendant and suppressed the defendant's statements as fruits of that unlawful conduct. *Id.* at 309-10. At trial, the defendant did not testify. However, he presented testimony of a family friend, who testified that on the day of the shooting the defendant's hair had been black. *Id.* at 310. Over the defendant's objection, the trial court permitted the

prosecution to offer the defendant's suppressed statements to impeach the friend's credibility. *Id.*

¶ 22 On appeal, the Illinois Appellate Court reversed the conviction, holding that the statements were improperly admitted. *Id.* But the Illinois Supreme Court reversed the intermediate appellate court, ruling that the impeachment exception ought to be expanded to permit impeachment of defense witnesses other than the defendant himself, and thus "deter the defendant from engaging in perjury 'by proxy.'" *Id.* at 311.

¶ 23 The United States Supreme Court disagreed. The Court recognized that the impeachment exception "further[s] the goal of truth-seeking by preventing defendants from perverting the exclusionary rule 'into a license to use perjury by way of a defense.'" *Id.* at 652 (quoting *United States v. Havens*, 446 U.S. 620, 626 (1980)). However, the Court clarified that "the exception leaves defendants free to testify truthfully on their own behalf; they can offer probative and exculpatory evidence to the jury without opening the door to impeachment by carefully avoiding any statements that directly contradict the suppressed evidence." *Id.* at 652-53.

¶ 24    Ultimately, the Court declined to extend the impeachment exception to encompass the testimony of all defense witnesses for two reasons.  First, the Court observed that "the mere threat of a subsequent criminal prosecution for perjury is far more likely to deter a witness from intentionally lying on a defendant's behalf than to deter a defendant, already facing conviction for the underlying offense, from lying on his own behalf." *Id.* at 653.  Second, expanding the exception to all defense witnesses "likely would chill some defendants from presenting their best defense and sometimes any defense at all — through the testimony of others." *Id.*  The Court was concerned that defendants would fear that a defense witness, "in a position to offer truthful and favorable testimony, would also make some statement in sufficient tension with the tainted evidence to allow the prosecutor to introduce that evidence for impeachment." *Id.*

¶ 25    Thus, the impeachment exception to the suppression rule permits the use of constitutionally excluded evidence to impeach a defendant's own untruthful testimony.  In this way, the exception "generally discourages perjured testimony without discouraging truthful testimony." *Id.*

## C. Application

¶ 26    Understandably concerned that admission of Carrethers's positive GSR test coupled with silence as to whether Johnson was also positive — or even tested at all — would potentially mislead the jury, the trial court sought to protect the truth-seeking function of the trial process by applying the impeachment exception. However, in doing so, the trial court expanded the impeachment exception even further than the Illinois Supreme Court's ill-fated attempt to do so in *James*.[4] The trial court erred.

¶ 27    The effect of the trial court's ruling was to chill Johnson's presentation of truthful and favorable evidence. This is precisely the danger the Supreme Court protected against when it limited the scope of the impeachment exception in *James*. As the Supreme Court made clear in *James*, the exception does not permit the use of otherwise suppressed evidence to contradict obviously untruthful testimony, so long as such testimony is not provided by the

---

[4] In our view, the Supreme Court in *James* spoke definitively regarding the constitutionally permissible extent of the *Walder* exception to the exclusionary rule. It is not the place of an intermediate state appellate court to extend the reach of *Walder* beyond the boundaries expressed in *James*. If such an extension is to be made, it must be made by a court higher than this one.

13

defendant himself.  It necessarily follows that the exception cannot possibly permit the use of such evidence to counter *truthful* testimony.

¶ 28    Johnson should have been permitted to offer truthful evidence related to the GSR testing conducted on individuals other than Johnson without fear of opening the door to the unconstitutionally obtained evidence related to his GSR test.[5]  Yet, because of the trial court's ruling, not only did the officers' unconstitutional search improperly result in the collection of inculpatory evidence, it also effectively shielded potentially exculpatory evidence from use by the defense.  Such a result falls far short of effectuating the "sole purpose" of the exclusionary rule, which is "to deter future Fourth Amendment violations."  *Davis v. United States*, 564 U.S. 229, 236-37 (2011).  Indeed, it arguably encourages future violations, by significantly softening the adverse impacts of an unconstitutional search by law enforcement.

---

[5] We do not suggest that it would be proper for Johnson to ask the jury to infer from this evidence that he either was not tested or that he tested negative.  However, Johnson's counsel acknowledged that he had no intention of advancing such an argument.

14

¶ 29     Because the trial court misapplied the impeachment exception, we conclude that the court abused its discretion.

¶ 30     The People argue that any error was harmless "under any standard." Again, we disagree. The People argue that evidence of GSR on Carrethers would likely have had little impact on the jury for several reasons: GSR is not conclusive proof of who actually fired a gun; there was a logical explanation for why Carrethers would have tested positive without having fired a gun; Carrethers's purported motive to kill Griego was "not compelling"; Carrethers's credibility was effectively attacked even without the GSR evidence; and the focus of defense counsel's closing argument was not on Carrethers as an alternate suspect, but rather on whether the prosecution had failed to prove that Johnson killed Griego. The People's argument, however, misapprehends the standard in this case.

¶ 31     Having found error, and because that error implicates Johnson's constitutional rights, we must reverse unless the People demonstrate beyond a reasonable doubt that there is no reasonable possibility the ruling impacted the verdict. *Hagos,* ¶ 11. Though the People correctly note that the GSR test is not conclusive, it is

certainly sufficient grounds on which to base an inference that Carrethers fired a gun.[6]  Similarly, regardless of whether Johnson's theory that Carrethers had a motive to kill Griego was compelling, it was at least one the jury may have found worthy of consideration. And although Johnson's counsel had been able to attack Carrethers's credibility, he was not permitted to fully explore the potential that she may have been an alternate suspect.  Finally, the focus of defense counsel's closing argument was necessarily a function of what evidence had been admitted.  Had he been able to present Carrethers's GSR results, his closing argument would likely have had a different focus.

¶ 32    Under these circumstances, we conclude that there is a reasonable possibility that the trial court's prophylactic ruling, which effectively precluded Carrethers's GSR evidence, affected the verdict.  At the very least, the prosecution has not carried its burden of proving otherwise.  Thus, the error was not harmless

---

[6] We note that GSR evidence was important enough to the prosecution that it vigorously defended against Johnson's efforts to suppress his GSR test results.

16

beyond a reasonable doubt.  Johnson's murder conviction must be reversed.

### III.  The Trial Court Did Not Err by Excluding Evidence That Carrethers Killed Her Husband

¶ 33    Johnson also contends that the trial court abused its discretion by excluding evidence that Carrethers murdered her husband, the only other person in the home the night Griego died.  He argues that this ruling further undermined his ability to present his defense that Carrethers was an alternate suspect and violated his right to confront and cross-examine witnesses.  Because this issue is likely to arise on remand, we address Johnson's contention but discern no abuse of discretion.

### A.    Additional Facts

¶ 34    Approximately five weeks after Griego's murder, Carrethers fatally stabbed her husband.  Although Carrethers was initially arrested for first degree murder, the Adams County District Attorney's Office did not file criminal charges because it concluded that Carrethers had acted in self-defense.[7]  Prior to Johnson's trial,

---

[7] The apartment in which both Griego and Carrethers's husband were killed is in Arapahoe County.  However, to avoid any

17

the prosecution filed a motion in limine to preclude evidence regarding the husband's death, asserting that it did not involve Johnson, did not result in criminal charges, and was irrelevant. Johnson objected, asserting that the nature and circumstances of the death might show that Carrethers testified at Johnson's trial to avoid charges being filed against her for the killing. In addition, Johnson argued that, given alleged similarities between how the husband was killed and how Griego was killed, the evidence was relevant to his alternate suspect theory.

### B. Standard of Review

¶ 35 We review a trial court's exclusion of evidence for an abuse of discretion. *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002). Because the exclusion of this evidence did not entirely foreclose Johnson from presenting his alternate suspect theory, any error would not be one of constitutional dimension. *See Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009) (rejecting the application

---

appearance of a conflict of interest arising from the fact that Carrethers was a witness in the prosecution related to Griego's murder, the matter was referred to a neighboring jurisdiction to independently determine whether Carrethers should be charged in the death of her husband.

of constitutional harmlessness where an erroneous evidentiary ruling did not "effectively bar the defendant from meaningfully" presenting his defense). Thus, should we determine that the trial court abused its discretion, we reverse unless the error was harmless. *Hagos*, ¶ 12.

## C. Applicable Law

¶ 36　　A defendant pursuing an alternate suspect theory may introduce evidence of that suspect's other acts to prove identity — that the same person who committed the other act also committed the charged crime. *People v. Elmarr*, 2015 CO 53, ¶ 39. However, "an inference that the alternate suspect committed the other acts and the charged crime is permissible only where the prior acts and the charged crime share sufficient similar characteristics or details." *Id.* "[T]he overarching relevance inquiry remains whether the evidence, taken collectively, establishes a non-speculative connection between the alternate suspect and the charged crime." *Id.* at ¶ 40. Finally, "[e]ven relevant alternate suspect evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." *Id.* at ¶ 43.

## D. Application

¶ 37 Johnson's first argument against the People's motion in limine was that the issue of Carrethers's involvement in her husband's death was relevant to impeaching her — that she may have had an incentive to testify favorably for the prosecution in order to avoid being prosecuted herself for the later homicide. We disagree.

¶ 38 As the trial court noted, a defendant is generally allowed broad cross-examination of a prosecution witness with respect to that witness's motive to testify where that witness is charged with or threatened with criminal prosecution for other offenses. *See People v. King*, 179 Colo. 94, 98, 498 P.2d 1142, 1144-45 (1972). However, at the time Carrethers testified, charges against her were neither pending nor threatened. Further, because the determination of whether to charge her was not made by the office prosecuting Johnson, there was no evidence to suggest that her testimony was bargained for by the prosecution in this case. Perhaps most importantly, as the trial court noted, Carrethers's initial statements to law enforcement occurred five months before she killed her husband. Finally, Johnson's contention that, because first degree murder has no statute of limitations,

Carrethers may have been motivated to testify favorably for the prosecution in the hopes of preventing some future change of heart by the Adams County District Attorney is pure speculation.

¶ 39    Thus, the trial court did not abuse its discretion in concluding that Carrethers's involvement in the death of her husband was not relevant to her motive or bias in this case.

¶ 40    The trial court also rejected Johnson's argument that this evidence was relevant to his alternate suspect defense. Again, we perceive no abuse of discretion.

¶ 41    The trial court noted certain similarities between the two incidents, including (1) the deaths occurred on the same couch in the same residence; (2) Carrethers moved or handled evidence after both deaths; and (3) both weapons were located under the couch cushion. However, the trial court noted that the husband's death involved a claim of self-defense sufficiently compelling that no charges were filed. We further note that, even under Johnson's theory, the killings were not similar; the motives for the two killings differed, as did the method of killing (Griego was shot, but Carrethers's husband was stabbed). We agree with the trial court that Johnson failed to establish more than a speculative connection

between Carrethers's killing of her husband in self-defense and Greigo's murder, and that the other acts evidence was "not distinctive or unusual enough" to support a finding that Carrethers was probably responsible for both crimes. *Id.* at ¶ 39 (quoting *People v. Salazar*, 2012 CO 20, ¶ 26).

¶ 42 Finally, applying a CRE 403 analysis, the trial court concluded that evidence that Carrethers killed her husband carried a substantial danger of unfair prejudice, confusion of the issues, and misleading the jury. Here, too, we perceive no abuse of discretion in the trial court's analysis and conclusion.

¶ 43 Because the evidence related to the death of Carrethers's husband was not probative for impeachment or for building an alternate suspect defense, and because any minimal relevance there may have been was far outweighed by the danger of unfair prejudice, the trial court did not abuse its discretion in preventing Johnson from presenting this evidence to the jury.

IV.   The Trial Court Did Not Err by Admitting Alleged Hearsay

¶ 44 Johnson claims that the trial court erred by admitting evidence of statements Carrethers claimed she heard Griego make. Despite our conclusion that Johnson's first degree murder

conviction must be reversed, we nevertheless review this contention because it is at least in part aimed at Johnson's conviction for menacing as well. We discern no basis for reversal.

## A. Additional Facts

¶ 45    In a written motion, the prosecution sought to admit under CRE 807 certain statements Carrethers said she heard Griego utter. Specifically, the motion identified the following statements.

- "If you hit me again, I'm going to call the police, you said you weren't going to hit me";

- "I don't know them," (said about Eva and Pasquale on the evening of the murder, after Johnson had pointed the gun at Eva); and

- "Oh my god, what are you doing?", after which Carrethers heard Johnson respond, "shut up" and then heard two gunshots.

¶ 46    Johnson opposed the motion, arguing that admission of the evidence would violate his rights under Colorado's Confrontation Clause. After a hearing, the trial court overruled Johnson's objection and granted the prosecution's motion.

¶ 47     At trial, the statements came into evidence through the video recording of Carrethers's interview with police and testimony from a police officer about that video.  In the video recording, Carrethers also said that Griego had previously told her that Johnson had threatened to kill her.

## B.     Standard of Review

¶ 48     We review evidentiary rulings for an abuse of discretion. *Nicholls v. People*, 2017 CO 71, ¶ 17.  Because Johnson preserved these issues, we will determine if any error requires reversal by applying the harmless error test.  *Id.*  Under this test, "[i]f a reviewing court can say with fair assurance that, in light of the entire record of the trial, the error did not substantially influence the verdict or impair the fairness of the trial, the error may properly be deemed harmless."  *People v. Gaffney*, 769 P.2d 1081, 1088 (Colo. 1989).

¶ 49     We review de novo a defendant's claim that the trial court violated his Confrontation Clause rights, applying the constitutional harmless error standard to any error.  *Nicholls*, ¶ 17 (citing *Bernal v. People*, 44 P.3d 184, 198 (Colo. 2002)).

## C.    Applicable Law

¶ 50    Colorado's constitutional protection of the right to confront witnesses applies only to testimonial statements.  *Id.* at ¶ 33.  A testimonial statement is one made "under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  *Id.* at ¶ 22 (citing *Crawford v. Washington*, 541 U.S. 36, 51-53 (2004)).

¶ 51    "'Hearsay' is a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  CRE 801(c).

## D.    Application

¶ 52    As a threshold matter, we note that none of the statements Johnson challenges is testimonial.  None of them was made to law enforcement, and none appears to have been made by Griego with an eye toward future use in court.[8]  Thus, Colorado's Confrontation Clause is not implicated by any of these statements.

---

[8] It is important to note that the testimonial inquiry is focused on the circumstances under which the declarant (i.e., Griego) made the statement.  *Nicholls v. People*, 2017 CO 71, ¶ 33.  Whether or not Carrethers made her statements to police understanding they would be used in court is irrelevant to this inquiry; because

¶ 53    Nor is the hearsay rule implicated by at least some of the statements.  For example, Griego's statement that she did not know Eva and Pasquale was clearly not offered for the truth of the matter asserted; the prosecution's case assumed that she knew them.  And her exclamation "Oh my god, what are you doing?" is not a declarative statement because there is no assertion being made. Because these statements were not hearsay, their admission was not evidentiary error.[9]

¶ 54    Another of the statements, although not containing a direct assertion, may nevertheless meet the definition of hearsay.  When Griego told Johnson, "If you hit me again, I'm going to call the police, you said you weren't going to hit me," she was at least implying that Johnson had hit her in the past.  An implied assertion may qualify as a hearsay statement if the statement "was intended [by the out-of-court witness] to imply to the testifying witness a separate fact in question at trial."  *People v. Griffin*, 985

---

Carrethers was present in the courtroom and subject to cross-examination about her statements to the police, her testimony presents no confrontation issue.

[9] We may affirm an evidentiary ruling on any ground supported by the record.  *People v. Brown*, 2014 COA 155M-2, ¶ 15.

P.2d 15, 17-18 (Colo. App. 1998). Because we cannot tell from the record whether Griego intended Carrethers to overhear the statement and infer that Johnson was hitting her, we will assume this statement was an implied assertion.

¶ 55    The final challenged statement — i.e., that Griego told Carrethers that Johnson threatened to kill Griego — was clearly hearsay.

¶ 56    Nevertheless, we need not resolve whether these two statements were erroneously admitted under CRE 807. Neither the threat to Griego nor the implied assertion that Johnson had hit Griego in the past had any bearing on the allegation that Johnson pointed a gun at Eva. Thus, because these statements would have had no impact on the jury's guilty verdict on the menacing charge, any error that may have occurred by admitting the statements was harmless.[10]

---

[10] The statements are relevant to the murder conviction. However, because hearsay analysis is inherently a fact-specific and context-driven one, and because we cannot predict the context in which this evidence may, if at all, arise on retrial of that charge, we do not address Johnson's contention as it relates to the murder charge.

¶ 57    Thus, we conclude that there is no basis to reverse the menacing conviction.

## V.    Conclusion

¶ 58    Johnson's conviction for menacing is affirmed.  His conviction for first degree murder is reversed, and the case is remanded for a new trial on that charge.

JUDGE BERGER concurs.

JUDGE TAUBMAN concurs in part and dissents in part.

JUDGE TAUBMAN, concurring in part and dissenting in part.

¶ 59    This case presents the question of whether a defendant in a criminal case may retain the benefits of an evidentiary ruling in his favor concerning gunshot residue (GSR) when he proposes to introduce GSR evidence found on the woman in whose home the victim was killed.

¶ 60    Resolving this issue requires us to analyze two United States Supreme Court cases addressing whether a defendant in a criminal case may use the Fourth Amendment as both a sword and a shield — that is, to exclude evidence obtained in violation of the Fourth Amendment and then use the exclusion of that evidence to permit the introduction of other evidence the defendant considers necessary to present a complete defense. Resolution of this issue also requires us to analyze the applicability of the "opening the door" doctrine, which permits a court to allow the introduction of otherwise inadmissible evidence to prevent a party from gaining an unfair advantage or misleading the jury.

¶ 61    Because I conclude that the trial court properly ruled that defendant, Elmo Jesse Johnson, could not use the Fourth Amendment as both a sword and a shield, I would affirm his

29

judgment of conviction entered on a jury verdict finding him guilty of both first degree murder and felony menacing.  However, I agree with the majority's rejection of his contentions that the trial court erred in excluding alternate suspect evidence and allowing certain statements that Johnson contends were inadmissible hearsay.

## I.  Background and Procedural Posture

¶ 62    As a preliminary matter, I agree with and, thus, adopt the majority's recitation of the factual background.  I also agree that the matter is properly before us.  *Supra* ¶ 14.  However, I provide a more detailed background where necessary to support my analysis.

## II.  Opening the Door

¶ 63    Johnson contends that the trial court erred in warning him that, if he presented GSR evidence found on his sister, Toni Carrethers, he would open the door to allow the prosecution to introduce the GSR evidence suppressed by the trial court under the exclusionary rule.  He asserts that this ruling forced him to choose between exercising two constitutional rights — the right to present a complete defense and his right to exclude evidence seized in violation of the Fourth Amendment.  I disagree.

## A. Additional Facts

¶ 64 Crime scene investigators swabbed Johnson's hands and face without a warrant while he lay unconscious in the hospital. The swabs collected tested positive for GSR, as did swabs collected from Carrethers and the mother of Danielle Griego, Johnson's girlfriend. The trial court granted Johnson's motion to suppress the evidence collected from him because investigators violated his Fourth Amendment rights by obtaining it without a warrant. However, the court ruled that it "will not permit [Johnson] to use the Fourth Amendment as both a shield and a sword." Thus, it repeatedly warned Johnson that, if he intended to present evidence that Carrethers had tested positive for GSR, such evidence would open the door and permit the prosecutor to introduce the otherwise suppressed GSR evidence found on Johnson. The trial court later elaborated by stating that its concern was the defense misleading the jury into believing either that Johnson was never tested or that, if he was tested, no GSR was found on his body.

¶ 65 However, the trial court invited the defense to propose alternative ways to preserve both the suppression of the GSR found on Johnson and Johnson's right to present a complete defense. It

announced that, if the defense still intended to introduce evidence of the GSR found on Carrethers, it could propose a strategy to do so in a motion in limine. In response, the defense, at a hearing on Johnson's motion in limine, proposed the following:

> Judge, we would recall [the crime scene investigator, Maria] Pettolina [a witness for the prosecution,] and we would ask CSI Pettolina if she conducted a — or collected a sample for [GSR] testing. We would then call [the analyst]. We would elicit from [the analyst] the fact that Toni Carrethers was positive for GSR or for gunshot residue.

The People responded that, if the defense elicited this testimony from Pettolina and the analyst, "the People will inquire as to whether samples were also collected from Griego's mother and [three] others, which we don't want to do that, because that even begs the question even more if the jury hears about every single collection of GSR but for the defendant." The trial court agreed that allowing the jury to hear testimony that Carrethers and three others were tested would likely lead the jury to ask whether Johnson was also tested. Thus, ruling on the motion in limine, the court concluded that the defense's proposed witness testimony would open the door to the admission of the previously excluded evidence

32

of GSR on Johnson. Consequently, it held that not allowing the People to rebut the defense's proposed GSR testimony would mislead the jury.

### B. Standard of Review and Preservation

¶ 66 We review a trial court's determination of whether a party opened the door to responsive actions by the opposing party for an abuse of discretion. *People v. Lesney*, 855 P.2d 1364, 1366–67 (Colo. 1993). However, the broader question of whether a defendant can open the door to evidence otherwise barred by the exclusionary rule raises a question of law that we review de novo. *See People v. Melillo*, 25 P.3d 769, 777 (Colo. 2001).

### C. Applicable Law

¶ 67 A defendant may not employ the Fourth Amendment's exclusionary rule as both a sword and a shield. *See Walder v. United States*, 347 U.S. 62, 65 (1954). As the *Walder* Court stated:

> It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an

extension . . . would be a perversion of the
Fourth Amendment.

*Id.*

¶ 68   The issue before us is whether *Walder, James v. Illinois*, 493 U.S. 307 (1990), or some combination of the two applies to Johnson's desire to introduce evidence of GSR found on Carrethers, and whether the introduction of such evidence would open the door to allow the prosecution to introduce evidence otherwise excluded by the exclusionary rule.

¶ 69   Courts sometimes allow admission of otherwise inadmissible evidence when one party "opens the door" to such evidence by introducing evidence that would allow the party to gain an unfair advantage or mislead the jury.  *People v. Murphy*, 919 P.2d 191, 195 (Colo. 1996).  In *Walder*, 347 U.S. 62, the Supreme Court carved out an exception to the exclusionary rule to prevent a defendant from using a favorable Fourth Amendment ruling to allow him to present misleading or untrue evidence to the jury.  Although the Supreme Court did not use the phrase "opening the door," its decision was based on that principle.  Under the *Walder* exception, a prosecutor may introduce suppressed evidence to impeach a

defendant who attempts to distort the purpose of the exclusionary rule by deploying it as a "license to use perjury by way of a defense." *United States v. Havens*, 446 U.S. 620, 626 (1980) (quoting *Harris v. United States*, 401 U.S. 222, 226 (1971)). However, it carefully limited its holding to ensure it did not extend to instances in which the prosecution attempts "to smuggle [tainted evidence] in on cross-examination" by baiting a defendant into impeaching himself or herself.[1] *Id.* (quoting *Walder*, 347 U.S. at 66).

¶ 70　　In *James*, 493 U.S. 307, the Supreme Court further limited its holding in *Walder*. Unlike in *Walder*, it concluded that a prosecutor

---

[1] As the *Walder* court noted:

> The situation here involved is to be sharply contrasted with that presented by *Agnello v. United States*, 269 U.S. 20 [(1925)]. There, the Government, after having failed in its efforts to introduce the tainted evidence in its case in chief, tried to smuggle it in on cross-examinaton by asking the accused the broad question "Did you ever see narcotics before?" After eliciting the expected denial, it sought to introduce evidence of narcotics located in the defendant's home by means of an unlawful search and seizure, in order to discredit the defendant.

*Walder v. United States*, 347 U.S. 62, 66 (1954) (footnote omitted).

could not introduce evidence suppressed under the exclusionary rule to impeach a defense witness rather than the defendant. In so doing, the *James* Court allowed a defendant to introduce "probative and exculpatory evidence" from a defense witness, while discouraging perjury. *Id.* at 314.

¶ 71    Both *Walder* and *James* promote the balancing of the judiciary's truth-seeking function against the exclusionary rule's protections for the defendant and deterrence of unconstitutional police conduct. *See People v. Trujillo*, 49 P.3d 316, 323 (Colo. 2002).

¶ 72    In *LeMasters v. People*, the supreme court recognized the applicability of *Walder* but declined to apply its reasoning to the use of suppressed evidence for impeachment purposes when the evidence suppressed was not directly connected to the testimony the prosecutor sought to impeach. 678 P.2d 538, 543 (Colo. 1984). Thus, the issue the majority and I address today has not been decided by Colorado's appellate courts.

D. Analysis

¶ 73    The circumstances here fall somewhere between those in *Walder* and those in *James*. The suppressed evidence here would

36

have been introduced through neither the defendant nor a defense witness — yet, I would hold that the underlying premise of both cases applies. The exclusionary rule demands that illegally obtained evidence remain suppressed *unless* a defendant uses its unavailability to frustrate or obfuscate the court's truth-seeking function.

¶ 74 I conclude that the *Walder* exception to the exclusionary rule applies to the narrow circumstances of this case. Here, the defense proposed to recall a witness for the prosecution, *not* a defense witness (as in *James*), to introduce GSR evidence found on Carrethers.

¶ 75 The defense's argument at the hearing on its motion in limine demonstrates the distinctions between this case and *James*. Had the defense questioned prosecution witness Pettolina and the analyst about the GSR found on Carrethers, the prosecutor would have asked whether GSR samples were collected from others. Such evidence, without an admission that GSR evidence was also collected from Johnson, carried the potential to lead the jury to believe that Johnson was not tested or had tested negative for GSR.

¶ 76    Thus, I conclude that *James* is distinguishable from the present case.[2] In *James*, the prosecution impeached an eyewitness for the defense by introducing police officer testimony about a statement made by the defendant during the investigation of the charged crime that had been suppressed. The *James* Court reasoned that the truth-seeking rationale relied on to impeach the defendant in *Walder* "does not apply to other [defense] witnesses with equal force," because the threat of subsequent criminal prosecution for perjury already deters defense witnesses from lying. *James*, 493 U.S. at 317. It added that to broaden the *Walder* exception to encompass the impeachment of other defense witnesses would provide an incentive for law enforcement officers to illegally obtain evidence without furthering the truth-seeking function of the court and "dissuade defendants from presenting a meaningful defense through other witnesses." *Id.* at 317–20.

---

[2] I respectfully disagree with the majority's assertion that *James* unequivocally applies and that only a higher court may conclude otherwise. As discussed above, in my view, neither *Walder* nor *James* is directly on point. When this is the case, we distinguish relevant cases, including decisions of the United States Supreme Court, to reach what we believe to be a proper analysis and result.

¶ 77　In *James*, the Court rejected the theory of "perjury by proxy," stating that allowing one witness to testify contrary to another witness's testimony would not further the truth-seeking function because defense witnesses have far less incentive to perjure themselves than defendants, who are already faced with a possible criminal conviction.  The same concerns of perjury would not likely arise in circumstances — like those presented here — when a witness for the prosecution, recalled by the defense, testifies.  Thus, I conclude that the *James* decision rationale does not extend beyond the impeachment of defense witnesses' testimony and does not govern the circumstances presented here.

¶ 78　Rather, the focus in this case is whether the introduction of *some* physical evidence would mislead the jury to believe that *other* physical evidence was either not searched for or not found.  As Justice Stevens observed in his concurring opinion in *James*, the issue "is whether the admission of the illegally obtained evidence in this case would sufficiently advance the truth-seeking function to overcome the loss to the deterrent value of the exclusionary rule." *Id.* at 320.  Although Justice Stevens answered that question in the negative in *James*, I conclude the balance tips the other way here.

¶ 79 Here, the defense's presentation of GSR evidence found on Carrethers would allow the jurors to believe something that both parties knew was not true. Therefore, the court's truth-seeking function tilts the scale toward permitting the prosecution to introduce GSR evidence that had been previously excluded by the trial court to avoid misleading the jury.

¶ 80 I acknowledge Johnson's argument that he was presented with a Hobson's choice between effectuating his constitutional right to present a complete defense and enforcing an exclusionary rule decision in his favor. However, the trial court did not preclude the introduction of GSR evidence found on Carrethers. Rather, it warned him that, if he chose to introduce it in a manner that would mislead the jury, the prosecution would be allowed to admit the suppressed GSR evidence found on Johnson in rebuttal.

¶ 81 I conclude that Johnson knowingly surrendered any right to present the GSR evidence on Carrethers. *See Jeffers v. United States*, 432 U.S. 137, 153 n.21 (1977) (stating that an "alleged Hobson's choice between asserting the Sixth Amendment fair trial right and asserting the Fifth Amendment double jeopardy claim is illusory"; had the defendant chosen an alternative strategy, the

outcome may have been different). As discussed, GSR was collected from Carrethers, Griego's mother, and Johnson. Thus, it is not clear what the GSR found on Carrethers would show other than that she had touched the gun used to kill Griego, which was a fact already admitted. This suggests that the GSR found on Carrethers was not critical to enable Johnson to present a complete defense.

¶ 82 Rather than a Hobson's choice, this situation presented counsel with a tactical decision — whether the presentation of the GSR evidence found on Carrethers outweighed the prejudice of admitting the otherwise excludable GSR evidence. Counsel presumably decided, as he had the discretion to do, that such a risk would not have benefitted Johnson. *See Dooly v. People*, 2013 CO 34, ¶ 7, 302 P.3d 259, 262 ("While we have often noted that trial counsel is generally accepted to be the 'captain of the ship' with regard to tactics and matters of trial strategy, we have at the same time made clear that he must always apply his professional experience in making these tactical choices to effectively represent the interests of his client . . . ."). As the supreme court has noted, "A defendant may constitutionally be required to make difficult

41

strategic choices . . . ." *People v. Skufca*, 176 P.3d 83, 88 (Colo. 2008).

¶ 83 Moreover, contrary to Johnson's contention, the trial court's ruling regarding the admissibility of the otherwise suppressed GSR evidence found on Johnson did not prevent him from presenting an alternate suspect defense. The trial court's ruling meant only that he could not present the GSR evidence without also allowing the suppressed evidence to be admitted.

¶ 84 Accordingly, in my view, Johnson was deprived of neither his Fourth Amendment right nor his right to present a complete defense.

### III. Admission of Hearsay Statements

¶ 85 I agree with the majority's conclusion that the two statements "Oh my god, what are you doing?" and "I don't know them" were not hearsay. However, I write separately because I would also affirm the trial court's admission of "If you hit me again, I'm going to call the police, you said you weren't going to hit me" and the final

challenged statement — that Griego told Carrethers that Johnson threatened to kill Griego.[3]

## A. Standard of Review

¶ 86    We review the trial court's ruling admitting evidence under an exception to the rule against hearsay for an abuse of discretion. *People v. McFee*, 2016 COA 97, ¶ 17, 412 P.3d 848, 855. "A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or is based on an erroneous understanding or application of the law." *Id.* (citation omitted).

## B. Applicable Law and Analysis

¶ 87    The rules of evidence permit the court, in its discretion, to admit certain statements, not subject to the hearsay exceptions under CRE 803 and 804, that would otherwise constitute inadmissible hearsay if the statements offer sufficient guarantees of trustworthiness. CRE 807. To determine the admissibility of a statement under CRE 807, the supreme court has established five prerequisites:

---

[3] Because the majority reverses the murder conviction, it does not address the admissibility of those statements with respect to that charge.

43

> [1] [T]he statement is supported by circumstantial guarantees of trustworthiness; [2] the statement is offered as evidence of material facts; [3] the statement is more probative on the points for which it is offered than any other evidence which could be reasonably procured; [4] the general purposes of the rules of evidence and the interests of justice are best served by the admission of the statement; and [5] the adverse party had adequate notice in advance of trial of the intention of the proponent of the statement to offer it into evidence.

*Vasquez v. People*, 173 P.3d 1099, 1106 (Colo. 2007) (quoting *People v. Fuller*, 788 P.2d 741, 744 (Colo. 1990)). "The proponent must establish circumstantial guarantees of trustworthiness by a preponderance of the evidence." *People v. Preciado-Flores*, 66 P.3d 155, 164 (Colo. App. 2002). "In considering the trustworthiness of a statement, courts should examine the nature and character of the statement, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which the statement was made." *People v. Jensen*, 55 P.3d 135, 139 (Colo. App. 2001).

¶ 88    I agree with the trial court's analysis that the statements at issue were made to Carrethers during the course of her close relationship with Griego; thus, she had no reason to fabricate them.

I disagree with Johnson's argument that Carrethers fabricated the statements to avoid charges against her for killing her husband. No evidence suggested that Carrethers would be charged with her husband's death because the Adams County District Attorney's Office had concluded that Carrethers had acted in self-defense. Further, she was a hostile witness for the prosecution, claiming that she did not recall the statements she had previously told detectives. Because the statements satisfy the five prerequisites established in *Fuller*, I would hold that the trial court properly admitted them.

## IV. Conclusion

¶ 89      Accordingly, I concur in the decision affirming Johnson's conviction for menacing, but I dissent in part because I would also affirm his conviction for first degree murder.